Filed: October 29, 2002

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NELSON O. ROBLES,
                      *Plaintiff-Appellant,*

v.

PRINCE GEORGE'S COUNTY,
MARYLAND; JAMES ROZAR; ANTONIO
DEBARROS,
                      *Defendants-Appellees.*

No. 01-1662
(CA-99-31-PJM)

NELSON O. ROBLES,
                      *Plaintiff-Appellee,*

v.

PRINCE GEORGE'S COUNTY,
MARYLAND; JAMES ROZAR; ANTONIO
DEBARROS,
                      *Defendants-Appellants.*

No. 01-1728
(CA-99-31-PJM)

On Petition for Rehearing and Rehearing En Banc

Appellant/Cross-Appellee filed a petition for rehearing with petition for rehearing en banc.

The panel voted to deny rehearing.

A member of the Court requested a poll on the suggestion for rehearing en banc, and a majority of the judges voted to deny rehear-

ing en banc. Judge Luttig voted to grant rehearing en banc. Chief Judge Wilkinson, and Judges Widener, Wilkins, Niemeyer, Williams, Michael, Motz, Traxler, King, and Gregory voted to deny rehearing en banc.

Chief Judge Wilkinson filed an opinion concurring in the denial of rehearing en banc. Judge Luttig filed an opinion dissenting from the denial of rehearing en banc.

The Court denies the petition for rehearing and petition for rehearing en banc.

Entered at the direction of Chief Judge Wilkinson for the Court.

For the Court

_____

Clerk

WILKINSON, Chief Judge, concurring in the denial of rehearing en banc:

The panel opinion sets forth the basis for its decision, and I see no need to repeat that earlier discussion. *See Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002). Inasmuch as my good colleague has written in dissent, however, I offer these brief thoughts in response.

To read the dissent, one would think that the panel's decision had in some way been approving of the officers' behavior in this case. Far from it. The opinion disapproves what happened here in no uncertain terms. It condemns the conduct as "Keystone Kop activity" that was "foolish and unorthodox." *Id.* at 271. It recognizes that the officers' actions were "immature" and "adolescent." *Id.* at 270, 273. The decision leaves no doubt this type of conduct is unacceptable.

The panel also rejected the government's purported justification for the incident. According to Prince George's County, Montgomery County had been reluctant to accept any custody transfers of detainees

who belonged to Montgomery. Prince George's contended that the so-called prank here was merely a misguided attempt to convince neighboring Montgomery County to be more receptive to transfers of custody when the detainee was subject to outstanding warrants in Montgomery. *Id.* at 269. The panel rejected that assertion, finding that "it was hardly necessary to tie someone to a metal pole in a deserted parking lot, for however brief a time, in order to effect a transfer of custody." *Id.*

The panel also concluded that Robles had offered sufficient evidence that he suffered more than *de minimus* injury, but that issue was close. *See Bell v. Wolfish*, 441 U.S. 520 (1979); *Riley v. Dorton*, 115 F.3d 1159 (4th Cir. 1997) (en banc). After all, Robles was left alone for only 10 minutes, during which time no one bothered him. He concedes that he suffered no physical injury and that the officers told him that someone would pick him up there later. He offered no objective evidence (e.g. lost wages or medical expert testimony) to support his claim of psychological injury. In concluding that Robles had presented a triable issue of more than *de minimus* injury, the panel again gave Robles, not the officers, the benefit of the doubt.

Finally, the panel found a constitutional violation which allowed the plaintiff to proceed before a jury on his due process claim. It recognized that even if the officers were merely acting immaturely, and even if the panel accepted their assertion that they acted without specific intent to punish, due process guarantees were still implicated. The panel clearly acknowledged that even so-called police pranks of short duration and without any evidence of physical abuse can rise to the level of a constitutional violation. *Id.* at 269-70.

What the panel was unwilling to do was to take this holding of first impression and strip the qualified immunity defense of any notice component whatsoever. While stupid or inappropriate behavior on the part of the police can rise to the level of a federal constitutional violation, not every violation of state law does so. The Constitution is not a "font of tort law" to be "superimposed upon whatever systems may already be administered by the States." *Id.* at 271 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Thus, the fact that the officers "clearly appreciated the wrongfulness of their actions" does not mean that they understood their actions to be a violation of the federal Con-

stitution. *Id.* at 273. The Supreme Court has made clear that the very vagaries of the Due Process Clause mean that a specific enunciation of the principles of constitutional liability is required. *Anderson v. Creighton*, 483 U.S. 635 (1987). Under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), conduct must violate clearly established *constitutional* rights. *Id.* at 817-18. And under *Anderson* the contours of those rights must be clear. 483 U.S. at 640. To equate knowledge of wrongfulness in a generic sense with knowledge of unconstitutionality in a specific sense is not consistent with the rule of law. The latter requires notice, something to which even the worst criminal wrongdoer is entitled.

In reasoning as it did, the panel followed the two-step analysis in *Siegert v. Gilley*, 500 U.S. 226 (1991), and *Wilson v. Layne*, 526 U.S. 603 (1999). Under step one of that analysis, if a constitutional violation is found then it will nearly always be a "bad act." In fact the constitutional violation in *Wilson* could be argued to be a far more invasive act than the incident the panel confronted here. If every bad act under step one of the *Wilson* analysis sufficed by itself to answer the step two qualified immunity inquiry, there would simply be no qualified immunity defense. The district court felt strongly that the officers had not been placed on notice that their behavior, however dumb, violated a clearly established constitutional right.

My dissenting brother quotes at length from the majority's analysis under the first step of *Wilson*. The panel naturally relied on general language in *Bell v. Wolfish* to find a constitutional violation on these specific facts. The dissent indicates that the language of the step one analysis detailing the unconstitutionality of the officers' actions also suffices to satisfy the second prong of *Wilson*. However, the pitfalls of this approach should be apparent. If a court's general explanation of why an act is unconstitutional also suffices to supplant the need for specific notice, then there will be no independent force to the qualified immunity inquiry at all. The two steps of an analysis which the Supreme Court clearly intended to be sequential and distinct will simply collapse.

The concept of notice is rooted in case law. The panel emphatically did not require the plaintiff to come forward with a case on all fours with the present one in order to abrogate the qualified immunity

defense. *See Anderson*, 483 U.S. at 640. It pressed for even one case that would put the officers on fair notice of a constitutional infraction, but all the cases plaintiff advanced involved much more egregious or far different circumstances than those present here. The plaintiff was unable to provide a single decision to illustrate even the general point that a fleeting or misguided prank rose to the level of a constitutional violation. *Wilson* requires that a plaintiff point to at least some pertinent authority. 526 U.S. at 617. Plaintiff provided none at all.

Indeed plaintiff's major case, *Hope v. Pelzer*, 122 S.Ct. 2508 (2002), not only came down six years after the incident in question here, but was also so factually far afield as not to serve notice of any sort. And even under the far more egregious circumstances in *Hope*, the Court still divided sharply over the viability of the qualified immunity defense. It is impossible to compare a 10-minute incident with no physical abuse whatsoever to what the Supreme Court described in *Hope* as the "restricted position of confinement for a 7-hour period," which involved "exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." *Id.* at 2514. The Court in *Hope* went out of its way to stress the extended time period and the gratuitous infliction of pain, none of which, for all the stupidity of this behavior, came close to happening here.

The dissent fares no better than the plaintiff in citing even one case that is even factually in the neighborhood with this one. It simply contents itself with repeating the indisputable proposition that the behavior here was bad. But the Supreme Court requires that the availability of qualified immunity be determined through an examination of the case law, lest judging take leave of the touchstone of unlawfulness and become little more than a visceral exercise. "I know it when I see it" is not a substitute for qualified immunity analysis. In *Wilson*, the Court noted pointedly that "[p]etitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident that clearly established the rule on which they seek to rely." 526 U.S. at 616. Further, the plaintiffs failed even to identify "a consensus of cases of persuasive authority such that a reasonable officer" would have notice as to the unconstitutionality of his actions. *Id.* Likewise, in *Hope* the Court recognized the relevance of pertinent case law, holding that earlier circuit case law had put the

defendants squarely on notice that they were violating the plaintiff's constitutional rights. 122 S.Ct at 2516 (referencing *Gates v. Collier*, 501 F.2d 1291, 1306 (Former 5th Cir. 1974)). While *Hope* certainly did not require prior cases to have fundamentally similar facts, neither did it take leave of the need to inquire into the case law to give at least a semblance of specificity to what would otherwise be general and abstract constitutional principles.

These basic, simple principles worked well here. The officers did not go unpunished. In finding a constitutional violation, the panel allowed the plaintiff to proceed before a jury on his state due process claim for which Maryland provides no qualified immunity defense. *Robles*, 302 F.3d at 273. The district court believed that the first jury's award of well over a half a million dollars for a 10-minute incident in which there was probable cause to arrest and no evidence of verbal or physical abuse was too high. It offered the plaintiff $240,000 or the opportunity for a new trial, a course which is well settled under our precedent. *Id.* at 268. Plaintiff could have taken the $240,000 and banked it. Instead, he decided to roll the dice. An extensive trial was held on the issue of damages and the jury came back with an award of $40,000. *Id.* The panel upheld the jury award. What it was not prepared to do, however, was relieve the plaintiff of the consequences of a strategic decision that in hindsight the plaintiff wished he had made differently.

This was, in short, a case in which the system worked. It makes good sense to allow state law to hold officers to strict account while the parameters of federal violations are fairly defined. Moreover, the proper precedent has been established for the future. Police officers have been put on the clearest notice in this circuit that even brief episodes of foolishness implicate due process guarantees. And the plaintiff has had his day in court — and indeed recovered — on the very claim he is now complaining about.*

---

*The dissent asserts that the Fourth Amendment supplies the appropriate analytical framework, rather than the Due Process Clause. This is incorrect. *See Riley v. Dorton*, 115 F.3d 1159 (4th Cir. 1997) (en banc). The ill-advised decision to cuff Robles does not eliminate the fact that he was validly arrested and held for an hour prior to the cuffing. The cuffing was part of a crude prisoner transfer, not a fresh seizure or arrest; it was a confinement pending arraignment similar to that in the station house in *Riley*. That fact that Riley was ultimately arraigned while Robles was not in no way changes the analysis.

The basic point, however, pertains to the simple fairness of giving even unpopular parties proper notice. The Supreme Court requires that we do so, and we are not at liberty to disregard the discipline of its analysis. In *United States v. Lanier*, 520 U.S. 259 (1997), the Court made clear that officers in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as defendants charged with the criminal offense defined in 18 U.S.C. § 242. "The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *Id.* at 270-71. Police officers do bad things. Criminal defendants do bad things. But due process of law belongs to both.

LUTTIG, Circuit Judge, dissenting from denial of rehearing *en banc*:

I dissent from the court's denial of rehearing *en banc*. Even had the panel straightforwardly applied the proper qualified immunity standards, which it did not, I believe that this case would be worthy of reconsideration by the full court on the relatively fact-specific question of whether these officers are entitled to immunity for their particular actions. Irrespective of any larger doctrinal implications, it is significant when a court of appeals holds, as did this panel, that law enforcement officers today could not reasonably have known that handcuffing a pretrial detainee to a pole in a deserted shopping center, and abandoning him there in the middle of the night, admittedly for no law enforcement purpose whatsoever, would violate his rights under the Constitution. I think it clear that the constitutional impermissibility, not to mention the inherent danger of such, is sufficiently self-evident to require the denial of qualified immunity to the defendant officers. But because of what are in fact the much larger implications of the panel's breathtaking expansion of the qualified immunity doctrine and resulting constriction of 42 U.S.C. § 1983, I believe the case is an especially appropriate candidate for further review by the entire court.

It is on the *assumption* that appellant's restraint was in violation of his rights as a pretrial detainee under the Fourteenth Amendment that

I believe this case merits full court review for the foregoing reasons. I believe that the case is also deserving of *en banc* reconsideration, however, for the entirely unrelated, but equally fundamental, reason that the panel erred in holding that appellant did not suffer a violation of his Fourth Amendment rights to be free from unreasonable seizure, but, rather, a violation of his due process rights not to be punished prior to valid conviction and sentence. Properly viewed, appellant was not at all a detainee being held pending trial. Rather, handcuffed to a metal pole in a shopping center and intentionally abandoned by the arresting officers, appellant was an ordinary citizen subjected to an unconstitutional restraint.

I.

The undisputed facts are as follows. Officers of the Prince George's County Police Department arrested appellant on an outstanding traffic warrant from Montgomery County. Thereafter, at three o'clock in the morning, these sworn officers handcuffed appellant to a metal pole, in the middle of a deserted shopping center, and left him there, after anonymously notifying the Montgomery County Police Department that someone had handcuffed a person to a pole in the Hillandale Shopping Center. Appellant remained handcuffed to the shopping center pole for some time even after Montgomery County officers arrived at what they understood to be a crime scene, because of an inability to sever the handcuffs by which appellant was restrained. While the total time during which appellant was tied to the pole does not appear in the record, the delay prior to the arrival of the summoned officers was approximately 10-15 minutes and appellant remained tied to the pole for a sufficient time thereafter for a crime-scene photographer to be called, travel to the site, and record the scene. *See Transcript of the District Court's Summary Judgment Motions Hearing* at 3, 18, and 22 (Oct. 25, 1999) [hereinafter *Summary Judgment*]. During the time that appellant was handcuffed to the pole, according to the panel, he "did not know when or if anyone would come to rescue him or who might discover him." *Robles* v. *Prince George's County*, 302 F.3d 262, 270 (4th Cir. 2002). As the panel concluded, the officers "clearly appreciated the wrongfulness of their actions" and "freely admitted that their motive was unrelated to any legitimate law enforcement function." *Id.* at 273.

Notwithstanding these conclusions, the panel granted the officers full immunity for this unconstitutional conduct on the startling ground that law enforcement officers could not reasonably have been expected to know that handcuffing a pretrial detainee to a metal pole in a deserted shopping center at three o'clock in the morning, and abandoning him there, concededly for no law enforcement purpose whatsoever, would violate his rights under the Constitution.

In affirming the judgment below, the panel concluded that the district court had struck "a fortunate balance" "in this unfortunate case," *id.*, reaching that disposition that represented the "justice of the case." *Id.* at 266-67. Said the panel in summation, "[t]he district judge wisely let neither party have its way." *Id.* at 273-74.

I confess ignorance as to where the "justice of the case" lies. But under the law, it is quite clear that these officers are not entitled to immunity for their conduct. Although I would not attempt to do so, it could legitimately be maintained that the conduct at issue did not rise to the level of a constitutional violation at all (which is what the panel really seems to have believed), either because of its character as prank or because of the relative insignificance of the injuries. But it has now been almost a quarter century since the Supreme Court held in *Bell* v. *Wolfish*, 441 U.S. 520 (1979), that the official treatment of pretrial detainees that causes greater than *de minimis* injury and has *no* legitimate governmental purpose whatsoever amounts to unconstitutional punishment. *Id.* at 538-39; *see also Whitley* v. *Albers*, 475 U.S. 312, 322 (1986)(noting that the deference courts accord officers when deciding if conduct was reasonably related to a legitimate purpose "does not insulate from review actions taken in bad faith and for no legitimate purpose"). And, in the intervening years, the Court has been unwavering in its commitment to this principle. This long after *Bell* v. *Wolfish*, it simply is analytically indefensible to hold that the particular conduct of these officers violated appellant's rights under the Fourteenth Amendment *for the reasons that the officers' conduct served no law enforcement purpose whatsoever and inflicted more than de minimis injury*, and at the same time to hold that the officers are nonetheless entitled to official immunity for their unconstitutional conduct because they could not reasonably have known that their conduct was forbidden by the Constitution.

The panel here concluded, without reservation, that the defendants' treatment of appellant served absolutely no legitimate law enforcement purpose:

> The police behavior here was not reasonably related — indeed it was entirely unrelated — to any legitimate law enforcement purpose. Nothing the officers did served to enhance their own safety or the safety of others, or to ensure the presence of plaintiff at trial. Moreover, it was hardly necessary to tie someone to a metal pole in a deserted parking lot, for however brief a time, in order to effect a transfer of custody. The officers' actions thus served no conceivable law enforcement purpose . . . .

*Robles*, 302 F.3d at 269. In fact, *the defendants did not even attempt to justify their treatment of appellant on the basis of a legitimate law enforcement purpose*. *Id*. ("[T]he defendants . . . decline to justify their behavior on [the basis of a law enforcement purpose]."); *id*. at 273 ("[the officers] have freely admitted that their motive was unrelated to any legitimate law enforcement function").

The panel concluded that appellant suffered more than *de minimis* injuries as a result of the defendants' "arbitrary and purposeless" conduct:

> Robles was tied up in a dark and deserted location in the middle of the night. He did not know when or if anyone would come to rescue him or who might discover him. The resulting injury was more than de minimis.

*Id*. at 270.

And it even explained that the defendants "clearly appreciated the wrongfulness of their actions," *id*. at 273, those actions having even been in "violat[ion] [of] police regulations as well as state law," *id*. at 271. It follows inescapably from the composite of these facts and conclusions, not only that the defendants violated appellant's Fourteenth Amendment rights as a pretrial detainee (as the panel held), but also that they forfeited their official immunity because of their know-

ing violation of clearly established law (as the panel refused to hold). Indeed, so clear do I believe it to be that conduct like that at issue here is prohibited by the Constitution, that I would think it an affront to law enforcement officers to be told that they would *not* reasonably know that such conduct was violative of a detainee's rights.

Such is not to say that in every case in which a detainee's Fourteenth Amendment rights, as defined by the Court in *Bell* v. *Wolfish*, have been violated immunity will be unavailable and official liability will attach. In some cases, officers who injure detainees through conduct which, it is subsequently determined, served no legitimate law enforcement purpose and inflicted more than *de minimis* injury, will yet be entitled to immunity on the ground that the officers reasonably, but mistakenly, believed that their conduct was in service of a legitimate law enforcement purpose or would not have inflicted more than *de minimis* injury. However, on the panel's own terms, this is not such a case. These officers did not even attempt to defend their actions on the ground that they were in furtherance of a legitimate law enforcement purpose or could not have reasonably been expected to inflict injury.

I cannot help but believe that the panel's fundamental error lay in its attempt (candidly undertaken and, doubtless, well-intentioned) to discern the "justice of the case." Having held that appellant's non-*de minimis* injuries were sustained as a result of treatment that served no law enforcement purpose whatsoever, and therefore that appellant's rights under the Due Process Clause had been violated, the panel's concern for "striking the just balance in the case" caused it to jettison its theretofore rigorous analysis, and the very inquiry which, at the outset of its qualified immunity analysis, it correctly identified as the one that it was required to undertake — namely, whether appellant's right not to be subjected to serious injury by official conduct that is not in service of a legitimate law enforcement purpose was clearly established at the time of the incident in question. *Compare Robles*, 302 F.3d at 270 ("Because the officers' actions were not reasonably related to any law enforcement purpose and Robles suffered more than de minimis injury as a result of these actions, Robles' Fourteenth Amendment right to due process was violated."), *with id.* ("Even though the officers' actions deprived Robles of an actual constitutional right, Rozar and DeBarros may still be entitled to qualified

immunity if *that right* was not clearly established at the time of the incident.")(emphasis added).

Rather than conducting this proper qualified immunity inquiry, the panel instead, with citation to *Anderson* v. *Creighton*, 483 U.S. 635 (1987), simply admonished without elaboration that "a greater degree of specificity [*i.e.*, greater than simply alleging that conduct amounts to punishment] is required to overcome a defense of qualified immunity," *Robles*, 302 F.3d at 270. And then, without even so much as a further mention of the right, much less a discussion of the level of specificity at which the right ought to be defined, it merely recited that there are no cases factually on all-fours with the instant case, and concluded that the defendants *therefore* could not possibly have understood that their conduct violated appellant's rights.

Although its award of qualified immunity necessarily entails such a holding, so expedient is the panel's analysis on the qualified immunity question that it never even directly states the conclusion that the officers *could not have reasonably known* that their conduct was violative of the Constitution, a statement which, if made, perhaps would have jarred the sensibilities. *See*, *e.g.*, *id.* at 271 ("Although the officers' actions in this instance were foolish and unorthodox, *it is also not clear that* at the time they acted they should have reasonably known that their conduct violated [appellant's] constitutional rights.") (emphasis added). Indeed, if one carefully reads the panel's qualified immunity analysis, it appears that the panel did not even award these officers immunity on a basis justified in law. The fairest (if not only) inference from what the panel wrote is that it afforded the officers immunity, not at all on the ground that the officers could not reasonably have known that their conduct violated appellant's constitutional rights, the only ground upon which it could legitimately have done so. Rather, it appears that the panel actually granted qualified immunity either on the wholly *illegitimate* ground that the officers did not *subjectively* understand that their conduct violated clearly established law, or on the wholly *irrelevant* ground (irrelevant, that is, to the qualified immunity claim, as opposed to the threshold claim that the officers violated appellant's due process rights) that the conduct *did not rise to the level of a constitutional violation*:

> The officers should have known, and indeed did know, that they were acting inappropriately. *But whether they under-*

*stood their conduct violated clearly established federal law is an altogether different question.* The Constitution is not a "font of tort law" to be "superimposed upon whatever systems may already be administered by the States." *Paul* v. *Davis*, 424 U.S. 693, 701 (1976). The officers' conduct violated police regulations as well as state law and was dealt with under those provisions. *But not every instance of inappropriate behavior on the part of police rises to the level of a federal constitutional violation.*

*Id*. at 271 (emphases added).

In any event, having altogether bypassed the proper qualified immunity inquiry through this sequence of analytical nonsequitur, the panel left itself only with the comfortable task of rejecting what was by that time the strawman argument that cases decided on facts similar to those here clearly established that the defendants' conduct was violative of the Constitution. Unsurprisingly, because of the infrequency (to say the least) of such conduct, the panel found no cases that have held that handcuffing a pretrial detainee to a pole in a deserted shopping center in the wee hours of the morning, and abandoning him there, all admittedly for no law enforcement purpose whatsoever, is unlawful. And it found "inapposite" the facts of those few distant authorities that it cited as closest on their facts to those here, authorities which would have been distinguishable in any event because they addressed only whether specific conduct was reasonably related to a legitimate purpose — a question that does not even present itself in this case because the defendants' conduct concededly had *no* legitimate law enforcement purpose.

It should be apparent that I do not believe that a decided case is necessary in order for officers to be on fair notice that conduct like that by the officers here is violative of the Constitution. *See generally Wilson* v. *Layne*, 526 U.S. 603, 615 (1999)(holding that the precise conduct need not have been previously held unlawful in order for qualified immunity to be forfeited); *see*, *e.g.*, *Amaechi* v. *West*, 237 F.3d 356 (4th Cir. 2001)(denying qualified immunity and rejecting argument that previously decided case must have held that barehanded penetration of female genitalia during pat down search was unconstitutional); *McMillian* v. *Johnson*, 88 F.3d 1554 (11th Cir.

1996)(denying qualified immunity to officials who confined pretrial detainee on death row before his trial in order to punish him, despite the absence of any factually-similar precedent). And I would like to have thought that at this point in our history no court would hold, as did this panel, that law enforcement officers need an opinion from this court in order for them to be on notice that handcuffing a pretrial detainee to a metal pole in a deserted shopping center at 3:00 a.m. in the morning, and abandoning him there, *for no law enforcement purpose at all*, is unconstitutional. The sheer danger, not even to mention the constitutional irresponsibility, of such conduct is manifest as a simple matter of common sense, and is made all the more evident by events such as the recent spree of unpredictable sniper killings in the Washington, D.C., metropolitan area, which have even reached to *the identical shopping center in which appellant was handcuffed*. Such a holding as that of the panel analytically completes the transformation of qualified immunity into absolute immunity and goes a long way toward the dilution of section 1983 itself. It is rich irony, therefore, that the panel rhetorically asserts precisely the opposite in support of its conclusion. *See Robles*, 302 F.3d at 270 (stating, without elaboration, that the denial of immunity to the officers in this case would "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability")(citation omitted).

But, if decided authority is required, the panel would have found that authority extant, in the form of the Supreme Court's decision in *Bell* v. *Wolfish*, had it simply proceeded to inquire, as it originally said that it must, whether a pretrial detainee's right not to be injured by officials acting as did these officers was clearly established at the time of the incident. Faced foursquare with *Bell* v. *Wolfish*, the panel's answer on the immunity question assuredly would have been different.

Had it paused to consider seriously whether, as to the conduct here at issue, the particularized standards set forth by the Supreme Court in *Bell* v. *Wolfish* constituted sufficiently clearly established law, the panel would not have been able to reject so dismissively appellant's argument. Contrary to the panel's characterization of appellant's claim, *see Robles*, 302 F.3d at 270 — a characterization that enabled easy rejection — appellant did not assert merely the violation of his right as a detainee not to be punished. Rather, he asserted the consid-

erably more specifically-defined right, per *Bell* v. *Wolfish*, not to be seriously injured as a result of official conduct that serves no legitimate law enforcement purpose. The difference between the specificity of this right and that to "due process of law," which was held by the Court in *Anderson* v. *Creighton*, 483 U.S. 635 (1987), to be insufficiently specific to provide officials with adequate notice, could hardly be any greater. And the contours of this right are more than sufficiently apparent to place officers on notice *at least* that the conduct engaged in by these defendants violated the Constitution. To hold otherwise, as the panel did, *see Robles*, 302 F.3d at 270, *is*, as appellant maintains in his petition for rehearing *en banc*, tantamount to holding that "the very action in question [must] previously [have] been held unlawful," *Wilson* v. *Layne*, 526 U.S. at 615 — the panel's disclaimer that it did not so hold notwithstanding.

In sum, the panel begins and ends its opinion with the assurance that justice has been done in this particular case. In the sense that the term is invoked by the panel, I do not know whether the "just" result of this dispute is in a splitting of the baby, as the panel concluded. Or whether the more equitable result would instead be for us to hold that the defendants did not even violate appellant's rights under the Constitution. Or, for that matter, for us to hold that the officers both violated the appellant's rights and forfeited their otherwise applicable immunity. I am not even sure how to go about deciding what "justice" might require in this case.

However, under the applicable law it is clear not only that these defendant officers violated appellant's rights as a pretrial detainee, but also that they are not entitled to immunity for their actions, for they were in violation of clearly established law of which they not only reasonably should have been aware, but actually were aware. And in this case, as in all others, justice, in the only sense that matters, is done when we reason to that conclusion which is dictated by the particular rule of law applicable under the circumstances. We have the rule of law precisely because we recognize that, as human beings, we do have different notions of what constitutes "justice" in given circumstances, but agree that the determination of our rights and the protection of our liberties must not turn upon those individual notions, for one man's "justice" is another's deprivation of right.

## II.

I have, until this point, addressed myself to the panel opinion on the assumption that it correctly analyzed the officers' actions as a pretrial detention, rather than as a Fourth Amendment seizure, because of the significance to the law of the panel's holding that the defendants are immune for their unconstitutional conduct under the Fourteenth Amendment. However, I actually believe that the panel *entirely* misapprehended the case from the beginning by characterizing the officers' restraint of appellant as a pretrial detention, rather than as a Fourth Amendment seizure.

It is clear that, following his abandonment in the Hillandale Shopping Center by the Prince George's County police officers, appellant's restraint was not in any sense at all a condition of confinement, contrary to the panel's critically unexamined assumption. Upon abandonment of appellant, the Prince George's County police *terminated* their pretrial detention of appellant (and obviously at that time appellant was not in the custody of the Montgomery County police officers). The restraint of appellant thereafter, in the absence of a legitimate law enforcement purpose, constituted an unreasonable seizure in violation of the Fourth Amendment, not a condition of pretrial confinement.

That the officers terminated their pretrial detention of appellant is evident from their actions. But it is also apparent from their testimony that this was exactly what they intended to do. The officers frankly testified in depositions that they left appellant in the shopping center parking lot for the very purpose of terminating their detention of him and ending their responsibility for his custody and care. The officers, attempting informally to transfer the prisoner to the Montgomery County police, were told by officials of that jurisdiction to "process him" or "release him." The Prince George's County officers responded by declaring that they would not process him, and so would release him, *see Summary Judgment* at 35. Indeed, on the night in question, the officers reported to their own dispatcher that appellant was a "300 SOW," a police code meaning "Sent On Way" (*i.e.*, the officers released the detainee, sent him on his own way, and no further action was being taken). *See id.* at 55.

When, as here, officers decide to cease to secure an arrestee's presence at trial and in fact terminate their detention of that arrestee without relinquishing custody to other law enforcement personnel, any further restriction of the individual's liberty constitutes a new seizure, as such restriction can no longer be legally based on the prior seizure. Thus, at the moment following the Prince George's County officers' abandonment of appellant, handcuffed to the shopping center pole, appellant was, as a matter of law, seized anew, a seizure for which was required a valid law enforcement reason, such as probable cause or reasonable suspicion. Of course, as we know, that seizure was not justified by any law enforcement purpose, it having been, as the panel concluded, completely arbitrary and purposeless. It follows, therefore, that the defendants violated appellant's Fourth Amendment rights to be free from unreasonable seizure.

*Riley* v. *Dorton*, 115 F.3d 1159 (4th Cir. 1997), on which the panel relied for its holding that appellant was not unlawfully seized, neither supports that holding nor stands as authority foreclosing the proper holding that it was appellant's Fourth Amendment rights that were violated. It does not support the panel's holding, because appellant here, unlike the appellant in that case, plainly was not being held for trial. *Compare id*. at 1161 (noting that appellant was "being held prior to a formal adjudication of guilt"). Thus, no "broaden[ing] [of] Fourth Amendment protection beyond the point of arrest to cover all persons *in pretrial detention*," *id*. at 1162 (emphasis added), would be entailed by the holding that appellant was subjected to an unlawful seizure in violation of the Fourth Amendment.

By the same token, *Riley* does not, as the panel in error believed, foreclose the correct holding that appellant was unlawfully seized, because such holding does not in any way depend upon recognition of a "concept of continuing seizure." *Compare Robles*, 302 F.3d at 268 (citing *Riley* for the proposition that "this court has rejected any concept of a continuing seizure rule"). The unlawful seizure of appellant was complete, as I suggest above, at the moment following appellant's abandonment, handcuffed to the pole, by the defendants, because at that moment appellant was restrained for reasons wholly unrelated to any valid law enforcement purpose.

### III.

For the reasons stated, I would grant the petition for rehearing *en banc* and set this case for reargument before the full court to consider the significant holdings by the panel that the officers in this case could not reasonably have known that their conduct denied appellant his rights under the Fourteenth Amendment, and that appellant did not suffer an unreasonable seizure in violation of the Fourth Amendment's proscription against unreasonable searches and seizures. And I would hold that the panel fundamentally erred in both of these holdings. Accordingly, I respectfully dissent from my colleagues' denial of rehearing *en banc*.