**Edward Arthur JONES, Plaintiff–Appellant,**

v.

**Richard BUCHANAN, individually and in his official capacity as Sheriff of Avery County; Lee Keller, individually and in his official capacity as a Deputy of the Avery County Sheriff's Department, Defendants–Appellees,**

and

**Eddie Hughes, individually and in his official capacity as a Deputy of the Avery County Sheriff's Department; Avery County, North Carolina, a Body Corporate and Politic, Defendants.**

No. 01–2280.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 29, 2002.

Decided: April 15, 2003.

**ARGUED:** Eric Robert Bellas, Simpson, Kuehnert, Vinay & Bellas, P.A., Morganton, North Carolina, for Appellant. Rachel Ellen Daly, Womble, Carlyle, Sandridge & Rice, Winston–Salem, North Carolina, for Appellees. **ON BRIEF:** Daniel A. Kuehnert, Simpson, Kuehnert, Vinay & Bellas, P.A., Morganton, North Carolina; Robert M. Elliot, Elliot, Pishko, Gelbin & Morgan, P.A., Winston–Salem, North Carolina, for Appellant. Tyrus V. Dahl, Jr., James R. Morgan, Jr., Womble, Carlyle, Sandridge & Rice, Winston–Salem, North Carolina; Kimberly C. Stevens, Stevens & Withrow, P.L.L.C., Winston–Salem, North Carolina, for Appellees.

Before LUTTIG and MOTZ, Circuit Judges, and DAVIS, United States District Judge for the District of Maryland, sitting by designation.

Reversed and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the majority opinion, in which Judge DAVIS joined. Judge LUTTIG wrote a dissenting opinion.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises out of an incident in which a North Carolina deputy sheriff

knocked Edward Arthur Jones to the floor in the sheriff's office and then jumped on him, crushing Jones's nose, lacerating his lips and nose, and bruising his ribs. Prior to the deputy's use of force, Jones, although drunk and yelling obscenities, was unarmed and in a secured room; moreover, Jones maintains that his wrists were handcuffed behind him. It is undisputed that, at the time the deputy initiated force, Jones was not under arrest or suspected of any crime; rather, he had voluntarily come to the sheriff's office seeking assistance.

After Jones filed this action, alleging that the deputy's conduct constituted excessive force, in violation of Jones's constitutional rights and state law, a magistrate judge granted summary judgment to the deputy. The judge held, as a matter of law, that the deputy did not subject Jones to excessive force. For the reasons stated within, we reverse.

## I.

We set forth the facts "in the light most favorable to the party asserting the injury," in this case, Jones. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Brown v. Gilmore,* 278 F.3d 362, 369 (4th Cir.2002) ("[W]e are required to consider whether the facts, taken in the light most favorable [to the injured party], show that [the officer's] conduct violated a constitutional right.").

On the morning of November 3, 1999, Jones began drinking Canadian Mist whiskey, and he continued doing so throughout the day. At around 4:30 in the afternoon, Jones remembered that he "had to go to court the next day," and he concluded that his "best bet" was "to call somebody to come get [him] so [he] could sober up." He determined that he would "just to go to jail and sleep it off." Afraid that he would be held in contempt or lose his job if not sober, he wanted law enforcement authorities "to verify that [he] hadn't had anything else to drink."

Jones called 911 and told the operator that he was "drunk" and would like "for an officer to come get [him] and take [him] to jail so [he could] get sober." Jones waited at his home for about 30 to 45 minutes. When the police failed to arrive, he walked to the home of a neighbor, Lake Ollis, to "get [Ollis] to take [him] to jail." While Jones waited for Ollis's son to get dressed, Avery County Sheriff Richard Buchanan and Detective Pamela James arrived. Sheriff Buchanan testified that, after Jones threatened to kill himself unless the officers took him to jail, the Sheriff decided "that there was a possibility of suicide" and so that it was appropriate to transport Jones to the sheriff's department. Before leaving, Detective James asked Jones if he had any weapons. Jones responded that he had a pocket knife. Detective James removed the knife from Jones's pocket along with a can of beer from another pocket.

Sheriff Buchanan and Jones both testified that Jones then agreed to be handcuffed. The Sheriff testified that this was in keeping with "standing" department policy for transporting persons to the sheriff's department. Notwithstanding the handcuffs, Jones related that the Sheriff and Detective James were "nice" to him and that he, in turn, was polite, answering "yes, sir" and "yes, ma'am" to their questions. Ollis's son also remembered that, even though handcuffed, Jones responded to the officers' questions with "[y]es, sir" and "no, sir."

Jones related that while handcuffed in the police car on the way to the department, "the only thing [he] want[ed] to do [was] lay down and go to sleep." About a mile into the ride, Jones believes that he passed out. Sheriff Buchanan recalls that Jones was not a "problem" during the ride.

Upon arriving at the sheriff's department, one officer told Jones to "[g]et out of the car." Another "grabbed" Jones, who was still handcuffed behind his back, by the "center part of the handcuffs" and "got [him] out of the car ... because [he] was leaned over in the back seat ... with [his] head laying down on the seat." An officer then "jerked" Jones out of the car and "grabbed [him] by the shoulders and took [him] in the jail."

Inside the sheriff's department, while in the processing room, the officers "slammed [Jones] down in the chair with [his] hands behind [his] back." He "was drunk and got to cussing" because the officers hurt him when they got him out of the car "by [his] handcuffs." As soon as Jones was settled in the processing room, Officer Eddie Hughes testified that he locked the "exit doors" of the room, locking Jones inside.

Meanwhile, Deputy Lee Keller was meeting in an adjacent area with three local college students who needed fingerprinting for childcare work. Deputy Keller testified that he had to take the students by Jones in the processing room to reach the fingerprinting machine, and he did not want to take the students by Jones until Jones "was going to be quiet and settle down or we got him put in a holding cell or whatever."

When Jones asked the officers to "unhandcuff [him]" because he "was smothering," Deputy Keller called to him to quiet down. According to Jones, an officer "told [him] to shut the f—k up." Jones admits that he, too, used "pretty foul language [,]" but he maintains that he did not push, kick, or even threaten any of the officers. When the handcuffs were not removed, Jones "started to get mad" and then began to stand up "just a little bit," in an effort to alleviate his breathing difficulties by attempting to move his handcuffed hands to the front of his body by taking his hands around his back and under his feet.

As Jones started to stand up, "the next thing" he knew, an officer "knocked [him] down on the floor and jumped on [him]." Jones "felt a big knee ... in the back of [his] neck and one in [his] ribs." When he hit the floor, he felt the knee in his back and across his neck. Jones immediately knew that he had been hurt; he felt his nose go "whaa" and saw a "puddle of blood." Although Jones could not identify the officer who hurt him, Deputy Keller admits that he injured Jones.[1] Deputy Keller himself suffered no injuries from the incident, except a scratch on his hand.

Other than hazy memories of seeing "all that blood," of someone "hollering, 'Get the blood off of him,'" of not being able to breathe, and of some officers trying to help him, Jones recalls nothing more until the ambulance ride to the hospital. Deputy Keller and his fellow officers testified that after Keller knocked Jones to the floor, breaking his nose, Jones was angry and resisted, and that, as Officer Hughes "pushed" Jones into a holding cell, Jones hit the wall of the cell with the side of his

---

1. Deputy Keller offers a very different version of events. Deputy Keller asserts that Jones was not handcuffed while in the processing room, that Jones "kind of took a swing at" Keller by bringing his "arm up" toward Keller, and that Keller, in turn, accidentally hit Jones's nose while attempting to put him in a "chin lock" as a means of gaining control of him. However, as Deputy Keller's counsel correctly conceded at oral argument, in determining if the grant of summary judgment to Deputy Keller was proper, we must accept Jones's version of the facts, including that Jones was handcuffed behind his back during the incident and did not "swing" at Deputy Keller. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Indeed, the dissent's characterization of Jones's injuries as an "unforseen" consequence of Deputy Keller's use of force, *post* at 537, is inconsistent with the facts as presented by Jones, who describes being knocked down and jumped on.

head. Shortly thereafter, Jailer Alicia Blackburn saw Jones, "lying on the floor in a fetal position." She observed "blood on the floor next to his head and big clots of blood coming out of [his] nose." Officer Hughes testified that he too saw a puddle of blood about the size of a "basketball" on the floor next to Jones and noted that Jones was crying.

After Jailer Blackburn called for emergency medical services, an ambulance took Jones to the hospital. Dr. Michael Tomlinson diagnosed Jones with a "depressed comminuted fracture of the nasal bones," which is a fracture in which "the bone is splintered or crushed into numerous pieces,"[2] a 1.5 "centimeter laceration over the bridge of his nose," a 1.5 "centimeter laceration of the upper lip mucosal surface, which was gaping somewhat," and bruised ribs. Jones also had a blood alcohol level of .42. Ten sutures were needed to repair Jones's lip and nasal lacerations, and Jones then had surgery to repair his "severe," "significant[ly] displac[ed]" nasal fracture.

Sheriff Buchanan testified that immediately after the incident, Deputy Keller "made it clear" that he "had hit" Jones "with his fist." Deputy Keller "came through shaking his hand" and told Sheriff Buchanan that Jones has "'got a tough mouth.'" According to the Sheriff, Deputy Keller "was acting like he was proud of" hitting Jones with his fist. (At oral argument, Deputy Keller's counsel conceded that it would constitute excessive force, under the circumstances of this case, for Deputy Keller to have hit Jones with his fist.) Deputy Keller also "bragged" about the incident to the Sheriff's son. Officer Hughes testified that Keller commented "that'[his] knee accidentally hit [Jones's] nose.'" What happened to Jones so bothered Officer Hughes that he left work early on the day of the incident and apologized to Jones's neighbor.

When Jones's common-law wife, Rebecca Weedman, arrived at the department shortly after the incident, police officers gave her conflicting stories as to how Jones was injured. Deputy Chris Buchanan told her that Jones "fell." Officer Hughes told Weedman that Jones and a few of the officers "scuffled in the floor." An unidentified female officer explained to her that Jones had "passed out in the chair and fell out of the chair." Sheriff Buchanan told her that "'we went to put Eddie in the holding cell, and he hit his nose on the bars.'" Sheriff Buchanan testified at his deposition, however, that it was his "understanding" that Deputy Keller had "hit" Jones "in the face."

The sheriff's department did not immediately charge Jones with any crime arising from his conduct during this incident. After Sheriff Buchanan was informed of this lawsuit, however, he asked Deputy Keller to charge Jones. Deputy Keller testified that he refused to do so because he had "never had any intent to charge" Jones with anything and to do so "would look like we were being revengeful or something." Sheriff Buchanan then asked Officer Hughes and another officer to charge Jones. They did, but the charges "were later either dismissed or [Jones] was found not guilty."

On February 11, 2000, Jones filed this suit, alleging that Deputy Keller and Officer Hughes had subjected him to excessive force in violation of his constitutional rights and state law. Jones also asserted that Avery County and Sheriff Buchanan established and maintained a policy of encouraging the use of excessive force and failed to provide law enforcement officers with adequate training and supervision as to the proper use of force. In support of the latter assertions, Jones offered evidence that less than six months after the

---

2. Webster's Third New Int'l Dictionary 457     (3d ed.1993) (unabridged).

incident, the State of North Carolina removed Sheriff Buchanan from office and ultimately a federal court convicted him of felony offenses, including a civil rights violation. *See Harmon v. Buchanan,* 164 F.Supp.2d 649, 657 (W.D.N.C.2001) (finding in companion case, that Sheriff Buchanan made "statements to his deputies authorizing the use of what can best be described as excessive force"); *see also* Tammy Jones, *Buchanan Gets Prison Sentence,* Asheville Citizen–Times, Nov. 1, 2002, *available at* 2002 WL 23491632 (reporting on Sheriff Buchanan's sentence in connection with a March 2001 conviction for "slamm[ing] a handcuffed suspect's head against a patrol car," causing the man to lose three front teeth).

Sheriff Buchanan and Deputy Keller moved for summary judgment, contending, *inter alia,* that Jones had failed to produce evidence to support an excessive force claim. After the parties stipulated to the dismissal of Avery County and Officer Hughes, a magistrate judge, proceeding at the consent of the parties, granted summary judgment to Deputy Keller and Sheriff Buchanan. *Jones v. Buchanan,* 164 F.Supp.2d 734 (W.D.N.C.2001); *see City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

Although the defendants asserted qualified immunity as an affirmative defense, the magistrate judge did not explicitly discuss their entitlement to qualified immunity; rather the judge simply ruled, as a matter of law, that Deputy Keller's actions were reasonable, and thus did not constitute excessive force. The magistrate judge recognized that governing legal principles required him to view, in the best

light for Jones, the facts and all reasonable inferences that could be drawn from them, "however improbable they may seem." *Jones,* 164 F.Supp.2d at 736 (internal quotation marks omitted). Nevertheless, the judge failed to credit Jones's evidence that he posed no threat to anyone at the time Deputy Keller broke his nose and inflicted the other injuries; indeed, the judge appears to have totally disregarded Jones's evidence that he was handcuffed at that time.[3]

## II.

■ In excessive force cases, entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." *Saucier,* 533 U.S. at 200, 121 S.Ct. 2151. The "threshold question" requires a court to resolve the issue that forms the basis of the magistrate judge's decision here—whether, "[t]aken in the light most favorable to the party asserting the injury, … the facts alleged show [that] the officer's conduct violated a constitutional right." *Id.* at 201, 121 S.Ct. 2151. "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail. *Id.*

■ However, if, taking the allegations or evidence (depending on the procedural posture of the case) in the best light for the plaintiff, the plaintiff has stated a violation of a constitutional right, we proceed to the second step. "[T]he next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. *Id.* If not, the qualified immunity

---

**3.** The magistrate judge offered no explanation for failing to credit Jones's testimony that he was handcuffed throughout the incident. Yet, in a companion excessive force case involving Sheriff Buchanan and the Avery County Sheriff's Department, the same magistrate judge refused to grant summary judgment to the defendants, relying heavily on the fact that the plaintiff contended that he was handcuffed when a deputy subjected him to force. *See Harmon,* 164 F.Supp.2d at 654.

doctrine still provides a defendant officer with immunity from suit. If so, summary judgment must be denied.

Therefore, in order for Jones to defeat the defendants' motion for summary judgment, (1) he must have stated the violation of a constitutional right, and (2) that right must have been clearly established at the time he suffered his injuries, November 3, 1999.

### A.

■ We turn first to the "threshold" question: whether, "[t]aken in the light most favorable to the party asserting the injury," the facts show that Deputy Keller's "conduct violated a constitutional right." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Jones argues that the facts, considered in the light most favorable to him, demonstrate that Deputy Keller violated his Fourth Amendment rights. Deputy Keller recognizes that the Fourth Amendment constitutes the specific basis for the right allegedly infringed here—that is, the Fourth Amendment right to be free from unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The deputy maintains, however, that his conduct constituted no violation of Jones's Fourth Amendment rights.

■ The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen. *See Graham*, 490 U.S. at 395, 109 S.Ct. 1865; *see also id.* at 395 n. 10, 109 S.Ct. 1865 ("A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, ... in some way restrained the liberty of a citizen." (internal quotation marks omitted)). A court determines whether an officer has used excessive force to effect a seizure based on a standard of "objective reasonableness." *Id.* at 399, 109 S.Ct. 1865. We consider the facts "from the perspective of a reasonable officer on the scene," and avoid judging the officer's conduct with the "20/20 vision of hindsight," recognizing that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. We do not consider the officer's "intent or motivation." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir.1996) (citing *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865). Rather, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* (citing *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865).

■ We weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). This test requires us to determine the reasonableness of an officer's actions and is "not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Instead it "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

■ Those facts and circumstances include "the severity of the crime at issue," whether the "suspect poses an immediate threat to the safety of the officers or others," and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. The extent of the plaintiff's injury is also a relevant consideration. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *Pressly v. Gregory*, 831 F.2d 514, 517 (4th Cir.1987). The "question [is]

whether the totality of the circumstances justified a particular sort of . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see also Rowland*, 41 F.3d at 173 (stating that courts must avoid making "[a]rtificial divisions in the sequence of events" and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances").

Deputy Keller contends that, given Jones's conduct, "a reasonable officer on the scene," could have perceived that Jones posed an "immediate threat to the safety" of the deputy or others, justifying the force applied, i.e., knocking Jones to the floor, jumping on him, and breaking his nose. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Jones maintains that, viewing the facts and all fair inferences from them in the light most favorable to him, this conclusion is simply not possible and, therefore, Deputy Keller violated his Fourth Amendment right to be secure against the use of excessive force.

To resolve this question of whether the necessity for force outweighed Jones's constitutional rights, we examine each of the *Graham* factors in turn. First, we consider the "severity of the crime at issue." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Here, there was *no* crime at issue; Jones voluntarily went to the station for assistance in recovering from excessive alcohol consumption. In recent years, we have twice confronted situations in which a plaintiff, subjected to police force, had committed no crime; in each we held that

the plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force. *See Clem v. Corbeau*, 284 F.3d 543, 545–47 (4th Cir.2002); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir.2001). Even in a case in which the plaintiff had committed a crime, when the "offense was a minor one," we have found that the first *Graham* factor weighed in plaintiff's favor and upheld the denial of summary judgment to the defendant police officer. *See Rowland*, 41 F.3d at 174; *see also Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir.2002) (holding that this factor "strongly weigh[ed] in favor" of plaintiff because officer used force even though plaintiff had committed "insignificant crime"). Accordingly, in this case, in which Jones committed *no* crime, this first factor clearly weighs in his favor.[4]

We next consider whether "a reasonable officer" could have perceived that Jones "pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Deputy Keller, of course, now maintains that he did perceive such a threat. But Jones can point to evidence which suggests either that Deputy Keller is not credible on this point or that the deputy's perception of a threat was not objectively reasonable.

First, when Deputy Keller knocked Jones to the floor and jumped on him, breaking his nose, lacerating his face, and bruising his ribs, it is undisputed that Jones was neither armed *nor suspected of being armed.* See Rowland, 41 F.3d at 174 (upholding refusal to grant summary judgment to police officer in excessive force

---

4. Although agreeing that Jones was not under arrest for any crime, the dissent suggests, *post* at 541 n. 4, that we err in concluding that Jones "had neither committed, nor was suspected of committing any crime," because Deputy Keller believed that Jones was under arrest and his is the relevant perspective. Deputy Keller, however, contradicted himself on this point. Although Keller testified that

he heard a radio code that indicated (to him) that Sheriff Buchanan was transporting an arrestee, he also testified that he was not permitted to place Jones in a holding cell, without a magistrate's permission, because Jones had not been charged with any crime. Viewing the facts in the light most favorable to Jones, we do not give substantial weight to Deputy Keller's inconsistent testimony.

case when plaintiff was not armed or "suspected" by the officer of being armed). Thus, the facts here differ markedly from those in many of the cases in which we have held that an officer could reasonably perceive the plaintiff posed an immediate threat to his safety or that of others. *See Anderson v. Russell,* 247 F.3d 125, 130 (4th Cir.2001) ("evidence conclusively establish[ed]" that officer "reasonably perceived" plaintiff "to be armed with a gun"); *Elliott,* 99 F.3d at 642 (suspect "pointed" handgun at officers "with his finger on the trigger" and did not comply with officer's order to drop the gun); *McLenagan v. Karnes,* 27 F.3d 1002, 1007 (4th Cir.1994) (although officer knew plaintiff was "handcuffed in front," he "reasonably believed" that another officer saw gun in plaintiff's hands, and "could not confirm" that plaintiff was unarmed); *Greenidge v. Ruffin,* 927 F.2d 789, 790 (4th Cir.1991) (officer reasonably believed that plaintiff suspected of a crime was reaching for a shotgun).[5]

Moreover, Deputy Keller himself acknowledges that before he initiated force against Jones "nobody else was in the process[ing] room" with Jones, and Deputy Keller does not dispute that Officer Hughes had separated and secured Jones in that room by locking the processing room's "exit doors." A fact finder could conclude that this evidence demonstrates that Jones posed no immediate threat to anyone before Deputy Keller entered the processing room and used force against Jones. *See Vinyard v. Wilson,* 311 F.3d 1340, 1348–49 (11th Cir.2002) (finding plaintiff posed no threat to reasonable officer on the scene when a "glass or plastic partition" separated officer from drunken, screaming plaintiff in patrol car).

Furthermore, at the time Deputy Keller initiated the force, Jones has testified that his wrists were handcuffed behind his back. Of course, Deputy Keller disputes this and Jones may not be able to prove he was handcuffed. But, in determining whether Deputy Keller is entitled to summary judgment, we must accept the facts in the light most favorable to Jones, and if Jones was handcuffed behind his back in a locked room, we find it hard to see how he would pose an immediate threat to anyone. *Cf. Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir.1996) (noting, in dismissing appeal for lack of jurisdiction after district court denied immunity to officer who pushed handcuffed, unarmed suspect into police car, causing knee injury, that "it is important to remember, [plaintiff] was already handcuffed, and the officers had ascertained that he was unarmed" prior to use of force). As in *Lee,* 284 F.3d at 1198, another recent case in which a police officer assertedly assaulted a handcuffed plaintiff, "when the facts are construed in the light most favorable" to Jones, it is difficult to

---

5. In addition to *Greenidge,* Deputy Keller cites only four out-of-circuit cases in support of his contention that Jones failed to proffer evidence sufficient to support an excessive force claim. These cases differ so markedly from the case at hand that Deputy Keller's reliance on them itself demonstrates the weakness of his argument. *See Edwards v. Giles,* 51 F.3d 155, 156 (8th Cir.1995)(holding no excessive force claim when plaintiff, driving stolen van, refused to stop for police, crashed his van, and then ran from police); *Dyer v. Sheldon,* 829 F.Supp. 1134, 1135, 1139–40 (D.Neb. 1993) (same when plaintiff assaulted his wife and then resisted arrest and officers' attempts to handcuff him by striking one officer on the temple and twice attempting to strike the other officer), *aff'd,* 21 F.3d 432 (8th Cir.1994) (affirmed without opinion); *Prymer v. Ogden,* 29 F.3d 1208, 1210, 1214 (7th Cir.1994) (same when plaintiff actively resisted arrest near known drug house with "number of suspicious onlookers" nearby); *Pride v. Does,* 997 F.2d 712, 714–15, 717 (10th Cir.1993) (same when officer subjected plaintiff, arrested for disorderly conduct and possible assault, only to pressure on his neck for 30 seconds, which caused "minimal immediate injury" and "no permanent injury").

discern "any legitimate law enforcement need" for the force applied in this case.

To be sure, when Deputy Keller knocked Jones to the floor and injured him, Jones concedes that he was drunk, angry, and using foul language. However, mere use of foul language, even a drunk's loud use of such language in a police station, does not justify an objectively reasonable police officer knocking the drunk down, jumping on him, and breaking his nose. As the Eleventh Circuit has noted, a drunken plaintiff's "screaming" and use of "foul language" in a confined area (there a patrol car) constitutes a mere "nuisance" and not an immediate threat to the safety of the officers or others under *Graham*. *See Vinyard*, 311 F.3d at 1347–48.

Deputy Keller also cannot justify his actions based on Jones's slight physical movement—simply *beginning to stand up* "just a little bit" while in handcuffs in an effort (according to Jones) to bring the handcuffs to the front of his body in order to alleviate breathing problems (not, as erroneously suggested by the dissent, *post* at 537 n. 1, in an attempt "to free his hands"). Jones maintains that he never pushed, kicked, or threatened anyone. Although Deputy Keller asserted in deposition that Jones "kind of took a swing at [him]," the deputy's counsel correctly conceded at oral argument that we must accept Jones's contention that he did not attempt to strike Deputy Keller. *Cf. Lee*, 284 F.3d at 1198–1200 (holding that slamming arrestee's head against trunk after securing him in handcuffs was "objectively unreasonable and clearly unlawful"); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir.2001) ("Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment."). For all of these reasons and taking the facts in the best light for Jones, as we must, the second *Graham* factor also weighs in his favor.

The third *Graham* factor—whether the object of the force "is actively resisting arrest or attempting to evade arrest by flight"—also favors Jones. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. In fact, in stark contrast to most excessive force cases, Deputy Keller does not even suggest that at the time he began to apply force, he had arrested, or attempted to arrest, Jones, or that Jones was attempting to evade arrest. Indeed, no officer contends that Jones was under arrest or resisting arrest at the time Deputy Keller initiated force against Jones. We recognize that, *after* Deputy Keller broke Jones's nose, the deputy and other officers maintain that Jones resisted them. But Jones makes *no* claim with respect to that time period. And, even after Jones allegedly resisted in response to his broken nose, no officer arrested or attempted to arrest him until weeks after the incident and only then perhaps in revenge for Jones's filing of the instant action.

Finally, the level of force used by Deputy Keller caused severe injuries—a nose crushed into numerous pieces, lacerations of the nose and lips, each requiring multiple sutures, and bruised ribs. This is another consideration in determining whether force was excessive. *See Rowland*, 41 F.3d at 174 (upholding denial of summary judgment to officer in excessive force case in which the officer inflicted "serious leg injury" on a misdemeanant); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir.1993) (per curiam) (same when officer cracked three teeth, cut plaintiff's nose, and inflicted facial bruises).[6] Again this factor weighs in

---

**6.** In addition to the severity of the injuries Deputy Keller inflicted on Jones, Sheriff Buchanan's testimony that Deputy Keller "made it clear" that he had hit Jones "with his fist," provides some evidentiary support for Jones's contention that the level of force was excessive.

Jones's favor; indeed, the severity of Jones's injuries provides still another ground for distinguishing this case from those in which we and other courts have held that a plaintiff has not established an excessive force claim. *See Saucier*, 533 U.S. at 209, 121 S.Ct. 2151 ("Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury."); *Brown*, 278 F.3d at 369 (plaintiff "alleg[ed] no injury of any magnitude"); *Mensh v. Dyer*, 956 F.2d 36, 40 (4th Cir.1991) ("It is undisputed that [plaintiff] suffered no physical injury as a result of the incident.").

In sum, Jones has presented evidence that he voluntarily came to the sheriff's department and was never under arrest or suspected of any crime. While there, although admittedly drunk, using foul language, and starting to stand up, he was unarmed, locked in a room by himself, and handcuffed with his wrists behind his back. Nevertheless, in order to quiet him down so that three college students could pass through the room for routine, non-emergency purposes, Deputy Keller knocked Jones to the floor and then jumped on him, crushing his nose, lacerating his nose and lips, and bruising his ribs. The "totality of [these] circumstances," *Garner*, 471 U.S. at 8–9, 105 S.Ct. 1694, does not justify "a reasonable officer on the scene" using the force applied by Deputy Keller. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Of course, jurors may choose not to credit Jones's evidence, but if they do, it would constitute no improper "second-guessing" to conclude that Deputy Keller violated Jones's Fourth Amendment right to be free from excessive police force.

### B.

Having determined that Jones has proffered evidence of violation of a constitutional right, we now consider whether Deputy Keller is nonetheless entitled to qualified immunity.

The Supreme Court has recently clarified the appropriate inquiry on this issue. *See Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515–16, 153 L.Ed.2d 666 (2002). Qualified immunity "operates' to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Id.* at 2515 (quoting *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151). For a constitutional right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ...; but it is to say that in light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted)).

The standard is again one of objective reasonableness: the "salient question" is whether "the state of the law" at the time of the events at issue gave the officer "fair warning" that his alleged treatment of the plaintiff was unconstitutional. *Hope*, 122 S.Ct. at 2516. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (referencing *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). Although earlier cases involving "fundamentally similar" or "materially similar" facts "can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* Even though the facts of a prior case may not be "identical," the reasoning of that case may establish a "premise" regarding an unreasonable use of force that can give an officer fair notice

that his conduct is objectively unreasonable. *Hope*, 122 S.Ct. at 2517.

Ten years before Deputy Keller's November 1999 use of force against Jones, the Supreme Court in *Graham v. Connor* had clearly established that all claims of excessive force in the course of any seizure of a free person must be analyzed under an "objective reasonableness" standard, taking into account the factors discussed above. *Graham*, 490 U.S. at 395–96, 109 S.Ct. 1865. Both before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.

So it is here. Jones has proffered evidence that Deputy Keller severely injured him by knocking him to the floor and jumping on him, even though Jones, although drunk and using foul language, was unarmed, handcuffed, and alone in a secured room in the sheriff's headquarters, having come there voluntarily and not under arrest or suspected of any crime. In reported cases prior to November 1999 and involving conduct that took place well before then, we and other courts have repeatedly denied qualified immunity to law enforcement officers in similar circumstances. *See, e.g., Rowland v. Perry*, 41 F.3d 167 (4th Cir.1994); *Rambo v. Daley*, 68 F.3d 203 (7th Cir.1995).

Indeed, courts have denied qualified immunity to police officers when the officer's use of force might seem to be more justified than Deputy Keller's, for instance because the officer employed force against a person, who, unlike Jones, was suspected of criminal activity or resisting arrest. *See, e.g., Kane v. Hargis*, 987 F.2d 1005 (4th Cir.1993); *Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir.1997). Courts have also

denied qualified immunity when an officer's force might have seemed objectively reasonable because that force resulted in less severe injuries to the secured person than those suffered by Jones. *See, e.g., Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341 (1st Cir.1995); *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir.1988). Thus, the law at the time of this incident—November 1999—certainly provided "fair warning" to a police officer that he was not free to use force in the manner Jones contends Deputy Keller did.

For example, in 1994, we considered an excessive force claim arising out of an incident occurring in November 1991. *See Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994) (cited with approval in *Saucier*, 533 U.S. at 210, 121 S.Ct. 2151 (Ginsburg, J., concurring in the judgment)). In that case, Officer Perry saw a woman at a bus station ticket window drop a five dollar bill, which the plaintiff, Otha Rowland, picked up and pocketed without attempting to return it to the woman. *Id.* at 171. Although Officer Perry then immediately asked Rowland to return the bill, Rowland "simply waved the money in the face of [the] openly distressed and tearful" woman and a ticket window attendant interpreted Rowland's acts "as a crude proposition to [the woman] rather than an attempt to return the money." *Id.* When Rowland left the bus station, Officer Perry followed him, having confirmed that he had not returned the money. *Id.* According to Officer Perry, not until Rowland began to run away did he administer force, "throwing his weight against Rowland's right leg and wrenching [Rowland's] knee," "seriously" injuring it. *Id.* at 172, 174. Thus, Officer Perry suspected Rowland of a crime (albeit a minor one) and maintained that Rowland attempted to flee and resisted arrest. Nevertheless, given that Rowland contended that he had never run away and the record provided "no sugges-

tion that Rowland was armed or that Perry suspected he might be," we held that a jury could find that "no reasonable officer could have believed [Officer Perry's] conduct to be lawful." *Id.* at 174. Accordingly, we held in 1994 both that Rowland had stated an excessive force claim and that Officer Perry was not entitled to qualified immunity.

Similarly, a year earlier, in *Kane v. Hargis*, 987 F.2d 1005 (4th Cir.1993), we considered an excessive force claim arising out of conduct taking place in August 1990. In *Kane*, Officer Hargis stopped the plaintiff after observing her "erratic driving" and, when she admitted she had been drinking, he arrested her. *Id.* at 1006. According to Officer Hargis, Ms. Kane then went "berserk," resisted arrest, and attempted to flee. *Id.* at 1007. Ms. Kane acknowledged that "she attempted to resist arrest and to flee," but she maintained that the officer, who substantially outweighed her, "reacted to her actions by pinning her ... to the ground" and, *after* he had secured her, "repeatedly pushed [her] face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face." *Id.* at 1006–08. Thus, once again even though the plaintiff admitted criminal culpability and resisted arrest, construing the remaining facts "in the light most favorable to the plaintiff," we held both that the plaintiff had set forth an excessive force claim and that the officer was not entitled to qualified immunity. *Id.* at 1008. We reasoned that, if a jury accepted the plaintiff's testimony, it "would have been 'apparent' [in 1990] to a reasonable officer" that his use of force was excessive because, after the officer had secured the plaintiff, she did not pose a threat to him and any additional use of force was unreasonable. *Id.*

A number of our sister circuits similarly so held well prior to November 1999. For example, in *Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341, 345, 352–

53 (1st Cir.1995), the First Circuit, citing *Rowland*, reversed summary judgment on qualified immunity grounds to an officer who removed the plaintiff, charged with trespass, from a restaurant, handcuffed her, and dragged her to a police car, bruising her legs, when plaintiff offered testimony that she posed no threat to the officers or the public and did not resist arrest. Similarly, in *Mayard v. Hopwood*, 105 F.3d 1226, 1227–28 (8th Cir.1997), the Eighth Circuit reversed a grant of summary judgment to an officer who slapped and punched a suspect, in handcuffs and leg restraints, even though the suspect had, prior to being completely restrained, kicked and hit an officer, physically resisted arrest, and shouted and screamed at officers. *See also Goff v. Bise*, 173 F.3d 1068, 1074 (8th Cir.1999) (in April 1999 opinion, upholding jury verdict of excessive force based on (disputed) evidence that, after officer and mayor handcuffed plaintiff, they then threw him to ground and choked him when he had "committed no crime" and "posed a threat to no one"); *Smith v. Mattox*, 127 F.3d 1416, 1418–19 (11th Cir.1997) (denying qualified immunity because the unconstitutionality of use of force was "readily apparent to the offic[er], notwithstanding the lack of caselaw" precisely on point, when officer, with "a grunt and a blow," broke arm of the unresisting suspect in course of handcuffing him, even though suspect had, minutes before use of force, threatened officer with baseball bat, run from police, and actively resisted arrest); *Rambo v. Daley*, 68 F.3d 203, 205 (7th Cir.1995) (affirming denial of qualified immunity and stating that "[t]he Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs," in case in which drunk driving suspect verbally resisted arrest); *Butler v. Norman*, 992 F.2d 1053, 1055 (10th Cir.1993) (affirming denial of qualified immunity to officers who as-

saulted handcuffed suspect); *Dixon v. Richer*, 922 F.2d 1456, 1458 (10th Cir.1991) (affirming denial of qualified immunity to officers who assertedly assaulted citizen, who was not suspected of any crime or of being armed and did not make any "aggressive moves or threats," *after* police had secured him by placing his hands against vehicle); *McDowell v. Rogers*, 863 F.2d 1302, 1303–04, 1307 (6th Cir.1988) (holding, even prior to *Graham*, officers not entitled to summary judgment when they hit handcuffed suspect, who had tried to cash stolen check and ran from police, even though suspect suffered no "serious or permanent injury"). Indeed, Deputy Keller has not cited a single case in which a court, after finding that an assertedly secured plaintiff has alleged a Fourth Amendment excessive force claim similar to the one at issue here, has nevertheless granted the defendant officer qualified immunity.[7]

Thus, years before 1999, it was clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others and had neither committed, nor was suspected of committing, any crime. The facts proffered by Jones—that Deputy Keller knocked him to the ground and jumped on him, causing severe injuries, when he, although drunk and disruptive, was hand-cuffed, in a secured room, neither suspected of any crime nor fleeing a crime scene—constitute just such an unreasonable use of force.

We note that the Eleventh Circuit recently considered very similar facts, arising out of an incident in 1998, and concluded that even a plaintiff who had committed a crime and been arrested nonetheless stated an excessive force claim, and that it "was clearly established" that the officer's conduct, as described by the plaintiff, violated her constitutional rights. *See Vinyard*, 311 F.3d at 1355. As the court explained,

> no objectively reasonable police officer could believe that, after [the plaintiff-arrestee] was under arrest, handcuffed behind her back, secured in the back seat of a patrol car with a protective screen between the officer and the arrestee, an officer could stop the car, grab such arrestee by her hair and arm, bruise her and apply pepper spray to try to stop the intoxicated arrestee from screaming and returning the officer's exchange of obscenities[.]

*Id.* These words have equal applicability here; we need only change the *Vinyard* court's language slightly:

> no objectively reasonable police officer could believe that, after a citizen, not under arrest, was settled in the sheriff's headquarters, handcuffed behind his back, secured in the processing room

---

7. The dissent seeks to distinguish some (but, by no means all) of the cases on which we rely, contending that they deal with persons "who, in contrast to Jones, were *not* acting dangerously or aggressively" at the time the police used force. *Post* at 540 n.3. The asserted distinction utterly fails because if we take the facts in the best light for Jones, as we must at this juncture, Jones too was "*not* acting dangerously or aggressively." Indeed, prior to Deputy Keller knocking Jones to the floor and breaking his nose, Jones, although drunk and using foul language, was unarmed, handcuffed, alone in a secured room in a police station, and neither under arrest nor suspected of any crime; thus, he was "acting" a great deal less "dangerously and aggressively" than the plaintiffs in other cases in which courts have upheld excessive force claims. *See, e.g., Smith*, 127 F.3d at 1418–19 (prior to challenged police force, plaintiff had threatened officer with baseball bat and resisted arrest); *Mayard*, 105 F.3d at 1227–28 (prior to challenged police force, plaintiff kicked and hit officer and resisted arrest); *Kane*, 987 F.2d at 1007 (prior to challenged police force, plaintiff resisted arrest and attempted to flee).

with locked doors between the officer and the citizen, the officer could knock the citizen to the floor, jump on him, break his nose, lacerate his face, and bruise his ribs to try to stop the intoxicated citizen from screaming and returning an officer's use of obscenities.

Therefore, taking the facts in the present record in the light most favorable to Jones, we cannot conclude that Deputy Keller is entitled to qualified immunity as a matter of law.[8]

8. The dissent contends that *Robles v. Prince George's County, Maryland*, 302 F.3d 262 (4th Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1634, 155 L.Ed.2d 486 (2003), compels the conclusion that "Deputy Keller is entitled to qualified immunity." *Post* at 535–536. Given that *Robles* involved not only very different facts but also a wholly different Constitutional provision, the dissent's heavy reliance on, and extended discussion of, *Robles* is as puzzling as it is unpersuasive. In *Robles*, Prince George's County police officers validly arrested Nelson Robles for an offense committed in a neighboring county and asked officers in that county to pick him up; when they refused to do so, the Prince George's County officers tied Robles to a metal pole at night and then anonymously reported his location to officers in the neighboring county, who picked him up 10 minutes later. Under circuit precedent, in order to establish a constitutional violation, Robles, as a validly arrested pretrial detainee, had to meet a far more rigorous standard than that at issue here. Rather than simply proving that the police acted unreasonably in violation of the Fourth Amendment, Robles had to prove that the police had violated the Due Process Clause, *i.e.*, their misconduct amounted to punishment *and* resulted in more than *de minimis* injury to him. *Id.* at 269. This is a difficult burden for any plaintiff, but particularly so for Robles since he conceded that no one bothered him during the 10–minute ordeal, admitted that he suffered no physical injury, and offered no objective evidence (*e.g.* lost wages or medical testimony) to support his claim of psychological injury. *Robles v. Prince George's County, Maryland*, 308 F.3d 437 (4th Cir.2002) (Wilkinson, J., concurring in the denial of rehearing *en banc*). Nevertheless, this court held that Robles had estab-

## III.

For all of these reasons, the trial court's grant of summary judgment is reversed and the case is remanded for further proceedings consistent with this opinion.[9]

*REVERSED AND REMANDED*

LUTTIG, Circuit Judge, dissenting:

It follows *a fortiori* from our holding in *Robles v. Prince George's County, Maryland*, 302 F.3d 262 (4th Cir.2002), that

lished a constitutional violation but, given the lack of any prior cases factually close to Robles' and the closeness of the question of whether he suffered more than *de minimis* injury, it also held that it could not conclude that "clearly established law" gave the officers "fair warning" that their conduct violated not just state law but also the Constitution. *See Robles*, 302 F.3d at 270–71. Even if one does not agree with this unanimous decision upholding the grant of qualified immunity to the officers or the full court's decision (10–1) denying rehearing *en banc*, Robles does not control the case at hand. Unlike the thankfully unusual conduct in *Robles*, the present case concerns a garden variety excessive force claim under the Fourth Amendment. While no prior case law involved conduct like that in *Robles*, countless courts, as noted above, have previously held that the conduct alleged here is unconstitutional. If Jones can prove these allegations, this prior case law certainly provided Deputy Keller (unlike the officers in *Robles*) with "fair warning" that such conduct violated the Constitution; in such circumstances, an officer is not entitled to qualified immunity. *See Hope*, 122 S.Ct. at 2515–16.

9. On appeal, Jones acknowledges that his "claim is primarily one for excessive force under § 1983" and that his state claims are coextensive with his federal claim. Brief of Appellant at 19 n.2; Reply Brief at 16. Therefore, as in *Rowland*, 41 F.3d at 174, we reinstate any "parallel" state law claims. Furthermore, given our holding that summary judgment in favor of Deputy Keller was inappropriate, we reinstate the derivative claim against Sheriff Buchanan in order to allow the magistrate judge to address it in the first instance at the appropriate time.

Deputy Keller is entitled to qualified immunity in this case. Because the majority fails to follow our precedent in *Robles,* and because that decision dictates that Deputy Keller is protected by the doctrine of qualified immunity, I dissent.

The police conduct at issue in *Robles* was, under law, entirely indefensible. Prince George's County police officers arrested Nelson Robles on an outstanding traffic warrant issued by neighboring Montgomery County. They drove Robles to a deserted shopping center, and, at three in the morning, tied him to a metal pole with flex-cuffs and left him. The court in *Robles* held that the officers had committed a Fourteenth Amendment violation under *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as the officers' actions "served no conceivable law enforcement purpose" and caused more than *de minimis* injury. *Robles,* 302 F.3d at 270. Indeed, the officers did not even argue that their actions had a legitimate law enforcement purpose. *Id.* at 269. Nevertheless, the panel awarded the officers qualified immunity on the ground that a reasonable police officer would not have known that handcuffing a person to a pole in a deserted parking lot at three in the morning and abandoning him there, all admittedly for no law enforcement purpose, was unconstitutional.

The court in *Robles* analyzed the plaintiff's claim under the Fourteenth Amendment's Due Process Clause and Jones' claim is pressed under the Fourth Amendment (as incorporated by the Fourteenth), but, at their core, both cases present the same essential claim that a police officer unnecessarily injured a detainee. There is at least one critical difference between this case and *Robles,* however. In *Robles,* the police officers offered no law enforcement justification for their actions, whereas here, Deputy Keller offers, and in fact had, a manifestly legitimate law enforcement need to restrain Jones.

The majority dismisses the necessity of Keller's actions, but that necessity is obvious, even to one who reads the majority's opinion. The majority states that Jones "never pushed, kicked, or threatened anyone," *ante* at 530, and that "if Jones was handcuffed behind his back in a locked room, we find it hard to see how he would pose an immediate threat to anyone." *Ante* at 529. These statements are premised upon at least two erroneous assumptions. First, the majority assumes that Jones' presence in a locked room somehow obviated the need to gain control of him. But the room in which Jones was locked was the *booking* room, a central artery of the police department. The police could hardly be expected to remain outside the booking room until Jones quieted down on his own. Indeed, as Deputy Keller testified, he was fingerprinting college students for volunteer work and he needed to walk the students past Jones in order to get to the fingerprinting machine. Thus, Deputy Keller needed to enter the booking room with the students.

Second, and frankly quite troubling, the majority appears to believe that a handcuffed person, evidently even one who is in the process of moving his cuffed hands to the front of his body, poses "no threat to the officer or others." *Ante* at 534. If the majority does so believe, then such a belief is naive. One does not need experience to know differently, but there is an abundance of painful experience confirming that a handcuffed person, especially one who has his hands in front of him, can still be very dangerous. *See, e.g.,* United States Department of Justice, *Law Enforcement Officers Killed and Assaulted* 49, 50 (2001) (describing instances in which law enforcement officers were *killed* by persons wearing handcuffs); *United States*

*v. Sanders,* 994 F.2d 200, 209 (5th Cir. 1993) ("Sander's argument is entirely dependent on the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm. As is sadly borne out in the statistics for police officers killed and assaulted in the line of duty each year, however, this assumption has no basis in fact.").

To be sure, whether Jones had a weapon is relevant to his dangerousness, but the fact that Jones did not have a weapon certainly does not, as the majority supposes, render him harmless. Indeed, it took four officers to finally subdue the handcuffed Jones. Despite the majority's contrary conclusion, there cannot be a serious dispute over whether the belligerent, uncooperative Jones presented a threat both to the personnel and civilians in the police department. Deputy Keller's take-down, while it had the unfortunate, and unforseen, consequence of injuring Jones, was undeniably an attempt to remove that threat. For that very reason, Deputy Keller presents a stronger case for qualified immunity than did the officers in *Robles.*[1]

Because the majority cannot distinguish *Robles,* it engages in a revisionist reading of that opinion. The majority characterizes *Robles* as a close, and accordingly uncertain, case with respect to the *de minimis* injury prong of *Bell v. Wolfish. Ante* at 535 n. 8. Citing not to the opinion in *Robles,* but, rather, to Judge Wilkinson's opinion concurring in the denial of rehearing *en banc, id.* (citing *Robles v. Prince George's County, Maryland,* 308 F.3d 437 (4th Cir.2002) (Wilkinson, J., concurring in the denial of rehearing *en banc* )), the majority attempts to minimize Robles' injuries, reciting that "he conceded that no one bothered him during the 10–minute ordeal, admitted that he suffered no physical injury, and offered no objective evidence (*e.g.* lost wages or medical testimony) to support his claim of psychological injury." The majority then states that it was the closeness of the case with respect to the *de minimis* injury prong of *Bell v. Wolfish,* coupled with the lack of factually similar cases that combined to require the grant of qualified immunity in *Robles. Id.* In other words, according to the majority, the qualified immunity analysis in *Robles* turned in large part upon the "closeness of the question" as to the seriousness of the injury sustained by the plaintiff.

However, the panel in *Robles,* of which Judge Motz was a member, said nothing at all to the effect that its decision to grant *qualified immunity* was dependent upon the closeness of the question as to injury. Nothing in the brief portion of the opinion devoted to the qualified immunity analysis suggests that the extent of injury was even considered in resolution of the qualified immunity issue; indeed the level of harm, which today is so central to the majority's interpretation of *Robles,* is not even mentioned in the qualified immunity analysis undertaken by the *Robles* panel. *See Robles,* 302 F.3d at 270–71.

The *Robles* opinion does discuss the extent of injury when it addresses whether Robles satisfied the *de minimis* injury

---

1. The majority suggests that Jones was really trying to bring his hands forward "to alleviate breathing problems," *ante* at 530, and not to free his hands. Jones' subjective intent, however, is *entirely irrelevant.* The proper perspective is that of a reasonable officer on the scene. A reasonable officer would have observed Jones moving his cuffed hands from behind him to his front. The fact that Jones would have had more mobility after executing this maneuver is an unavoidable effect of his action, which would be apparent to any officer observing him. That the greater freedom of movement was only an unintended consequence of a motivating desire to breathe more easily would *not* have been apparent to an observing officer. A reasonable officer need not be telepathic.

prong of the *Bell v. Wolfish* test. That discussion, however, belies the majority's interpretation today, for it states only, without so much as a hint that the issue was close, that the "injury was more than de minimis." *Id.* at 270.[2]

Thus, the *only* support for the majority's reading of *Robles* is Judge Wilkinson's opinion concurring in the denial of rehearing *en banc* of *Robles*.

In recent years, it has become more common on our circuit to attempt to add to, subtract from, or recharacterize the facts recited and relied upon in a challenged panel opinion, or even to fine-tune, if not fundamentally reshape, the legal analysis undertaken by the original panel, *in the course of opinions respecting the denial of rehearing en banc. Compare Robles v. Prince George's County, Maryland,* 302 F.3d 262 (4th Cir.2002), *with Robles v. Prince George's County, Maryland,* 308 F.3d 437 (4th Cir.2002) (opinion concurring in the denial of rehearing *en banc* ); *compare Harvey v. Horan,* 278 F.3d 370 (4th Cir.2002), *with Harvey v. Horan,* 285 F.3d 298 (4th Cir.2002) (opinion concurring in the denial of rehearing *en banc* ); *compare Johnson v. Collins Entertainment Co., Inc.,* 199 F.3d 710 (4th Cir.1999), *with Johnson v. Collins Entertainment Co., Inc.,* 204 F.3d 573 (4th Cir. 2000) (opinion concurring in the denial of rehearing *en banc* ); *see also Belk v. Charlotte–Mecklenburg Bd. of Educ.,* 211 F.3d 853 (4th Cir.2000) (opinion concurring in the denial of rehearing *en banc* ). These opinions respecting the denial of rehearing *en banc* are cloaked as mere recitations of the facts and reasoning of the panel opinions, not as revisions of those opinions.

But it is evident from a comparison of these opinions with the original panel opinions that the former actually are attempted revisions of the latter. In fact, not infrequently, the fullness, depth, and length of the subsequent writing confirms that it is nothing short of a rewriting of the panel opinion from scratch in response to arguments and authorities that were not considered or addressed by the panel.

These attempts at revision of binding panel opinions typically follow upon the *identification of errors in the panel's factual recitation or flaws in the panel's legal analysis by other members of the court* who, by their own written opinions, have drawn the panel opinion into question. That such attempts at revision prove irresistible on occasion is understandable; upon revelation of errors or oversights in either fact or law, there is a quite natural instinct to correct the error or oversight in anticipation of further review of the original decision by the *en banc* court or Supreme Court or in an effort to forestall altogether any further review. *But because these kinds of revisionist writings cannot be and are not the binding authority of the circuit,* they ultimately disserve the court and the public, in addition to justifiably confusing the bar and the bench as to the law of the circuit.

It is our solemn obligation in opinions not only to come to the correct conclusions under law, but to support those conclusions with full reasoning that incorporates and honestly addresses the relevant facts and precedents. I have long believed that the federal courts too often fall short in the discharge of this most important of our obligations. But be that as it may, the

---

2. In its discussion of the trial judge's remittitur of compensatory and punitive damages, *see id.* at 271–72, *Robles* does suggest that the injuries suffered by the plaintiff were not great. It would be nothing less than interpretive legerdemain, however, to maintain that this discussion, which was entirely independent of the qualified immunity analysis, actually demonstrates that the extent of injury (beyond *de minimis* ) determined in any part, much less large part, the panel's disposition on the qualified immunity question.

formal release of an opinion of law on behalf of the court is the final step in the court's deliberative process, not the first or merely another along the way toward the final decision. Identically as issued by the responsible panel, the panel decision is the binding law of the circuit.

Of course, we in the judiciary can make mistakes just like anyone else. We can fail to include relevant facts or even misstate facts. We can overlook authorities or misread them. From time to time, we can even misanalyze a case completely. But our obligation when we do err in these regards is to admit our errors forthrightly *and correct them in opinions that are, themselves, binding.* We owe nothing less to the parties and the public whom we serve. Indeed, the public respect that the judiciary enjoys is attributable in no small part to our institutional insistence upon the open and formal admission and correction of our misstatements and omissions. We can scarcely criticize others for misstatements, omissions and analytical errors if we turn a blind eye toward, rather than admit, our own.

The developed process for addressing the judicial error is the grant of rehearing (or of rehearing *en banc*) and the official correction of the error. Thus, if a convincing argument is made by a colleague in opposition to the denial of rehearing *en banc* (or by a party in a petition for rehearing *en banc*) that the panel has erred in the material facts predicate for its disposition or in its analysis of the law, rehearing by the panel—on the submissions if more is unnecessary—is available to address the argument squarely in a revised, but binding, opinion for the court. Or if the argument is of determinative importance and seemingly unanswerable within the four corners of the analysis upon which the panel members can agree, the argument may be addressed by the full court sitting *en banc. But it is not the estab-lished process, and ought never become such, that the authoring or another judge attempt the correction of factual or analytical errors or omissions in the panel opinion through a separate writing respecting a petition for rehearing or rehearing en banc.* The reasons that this practice of post-hoc rationalization must be discouraged are many, and need not be canvassed fully in the context of today's opinion. But two of these reasons are of especial importance, and deserve notation even in a passing discussion. First, the practice undermines respect for the courts, by leaving the parties and public bound by an opinion that at least one member of the panel has effectively acknowledged was factually or analytically inadequate, at the same time that it consigns the losing party to the appeal of a binding decision that is factually incorrect or legally unsound, but that is made to appear to the reviewing court as less deserving of further consideration by the gloss superimposed by the nonbinding opinion subsequently issued. Second, it sows the seed for confusion among the members of the bar and bench as to what the law actually is, *i.e.,* (where the facts are subsequently added to or subtracted from) whether the principle of law stated in the panel opinion is that confined by the facts as recited in that opinion or those as recited in the subsequent nonbinding opinion, or (where the principle of law itself is modified) whether the governing principle of law is that in the original panel opinion or that in the later opinion. And, in fact, it is not uncommon for the district courts of our circuit, as well as counsel, to cite to and to analyze our separate writings respecting the denial of rehearing *en banc* as if these writings, rather than the panel opinions that these writings seek to rehabilitate, might be the binding law of the circuit. *See, e.g., Martin v. Mendoza,* 230 F.Supp.2d 665, 672 (D.Md.2002) (quoting from the opinion concurring in the denial

of rehearing *en banc* in *Robles* ); *Cogburn v. DaimlerChrysler Corp.*, 2002 WL 31165151, at *3 (M.D.N.C.2002) (citing to the order, with accompanying opinions, denying rehearing *en banc* in *Rosmer v. Pfizer Inc.*, 272 F.3d 243 (4th Cir.2001)); *Club Ass'n of West Virginia, Inc. v. Wise*, 156 F.Supp.2d 599, 617 (S.D.W.Va.2001) (quoting from the opinion concurring in the denial of rehearing *en banc* in *Johnson v. Collins Entertainment* ); 1 Criminal Procedure § 2.7(c) n.197 (2d ed.1999) (citing opinion concurring in the denial of rehearing *en banc* in *Harvey v. Horan* ).

Having expressed this concern over separate writings that attempt amendments to our panel opinions, I must acknowledge that Judge Wilkinson's opinion concurring in the denial of rehearing *en banc* in *Robles* does characterize the *Robles* opinion as involving a "close" case with respect to the *de minimis* injury prong of the *Bell v. Wolfish* inquiry, just as Judge Motz says it does. But, as noted, our *precedent* in *Robles* does not rest on any such assessment of relative injury. Without belaboring the point, Judge Wilkinson's solitary opinion on the petition for rehearing *en banc* is just that, and for the reasons discussed it does not—in contrast to the panel opinion in *Robles*, which he earlier authored—represent the law of our circuit.

At the end of the day, it is apparent that different qualified immunity principles have been applied by the majority in this case than were applied by the panel in *Robles*. Although it would be of no relevance for the disposition of today's case, I would like to think that Judge Motz has reconsidered her concurrence in Judge Wilkinson's opinion in *Robles* based upon the principles of law that I laid out in dissent in that case, *see generally Robles v. Prince George's County, Maryland*, 308 F.3d 437, 441 (4th Cir.2002) (Luttig, J., dissenting from denial of rehearing *en banc* ). But whether she has or not, that opinion is the binding precedent in our circuit on the availability of official immunity for unconstitutional conduct by law enforcement. It unquestionably requires that Deputy Keller be afforded qualified immunity for his actions. And I would so hold.[3]

It is one thing to hold, as the court did in *Robles*, that officers who tied a passive man to a pole in a deserted parking lot at three in the morning and then abandoned him, with no legitimate law enforcement purpose whatever, *are* entitled to immunity. It is another altogether to hold, as the majority does, that a police officer who tried to get control of a drunk, verbally

---

**3.** Although it comes as no surprise, the majority is unable to cite even a single apposite case in support of its holding. All of the cases relied upon by the majority dealt with detainees who, in contrast to Jones, were *not* acting dangerously or aggressively. *See Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir.1997) (noting that the officer slapped and punched the restrained arrestee without any apparent reason); *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 353 (1st Cir.1995) (noting that "there is no suggestion that Alexis posed a threat to the peace or safety of anyone");, *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir.1995) (emphasizing that the police officers gratuitously punched a handcuffed and "passive" suspect); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir.1994) ("Row-

land posed no threat to the officer or anyone else.... Nor is there any real evidence that this relatively passive, retarded man was a danger to the larger, trained police officer."); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir.1993) ("It would have been 'apparent' to a reasonable officer in Hargis' position that, *after* he had pinned to the ground a woman *half his size* and the woman *did not pose a threat to him*, it was unreasonable to push her face into the pavement with such force that her teeth cracked." (emphasis added)). Plainly, none of these cases could have placed Deputy Keller on notice that his actions were unlawful. Of course, for this reason alone, our decision in *Robles* dictates that Deputy Keller be afforded qualified immunity.

belligerent, and angry arrestee[4] who was disrupting the police department's operations, disobeying direct orders to be quiet, and attempting to free his hands, is *not* entitled to qualified immunity.

The only discernible justification for such seemingly irreconcilable holdings is a different view of the "justice" of this case from the panel's view of the "justice" of the case in *Robles*.

---

4. The majority correctly points out that Jones was not under arrest. However, the relevant perspective is that of a reasonable officer. Deputy Keller testified that he thought Jones was under arrest, J.A. 112, and that perception is reasonable given that Jones was drunk and disorderly and was handcuffed in the booking room. That fact renders the majority's conclusion that Jones "had neither committed, nor was suspected of committing, any crime," *ante* at 534, erroneous.

Nor is the majority's conclusion saved by any purported inconsistency in Deputy Keller's testimony. Even had Deputy Keller subjectively believed that Jones was not under arrest, that would still not change the fact that a *reasonable* officer viewing Jones at the time of the challenged action could have concluded that Jones was under arrest.