**Landis A. COWLES, Plaintiff,**

v.

**Eric PETERSON and Scott Johnson, Defendants.**

**No. CIV.A. 4:03CV143.**

United States District Court,
E.D. Virginia,
Newport News Division.

Oct. 21, 2004.

Stephen Gerard Test, Robert Edward Travers, IV, Williams Mullen, Virginia Beach, VA, for Plaintiff.

Robert J. Llooyd, III, McGuirewoods LLP, McLean, VA, Robert William McFarland, Brian Andrew Wainger, Bryan Karl Meals, Stacy Marie Landis, McGuirewoods LLP, Norfolk, VA, for Defendants.

### MEMORANDUM OPINION & ORDER

JACKSON, District Judge.

Before the Court is the Motion of Detectives Eric Peterson ("Peterson") and Scott Johnson ("Johnson")(collectively "Defendants") for Summary Judgment. Specifically, Defendants ask the Court to grant summary judgment in their favor on the grounds that (1) qualified immunity shields Defendants from the alleged constitutional violations, (2) sovereign immunity protects Defendants from the state law claims, and (3) Plaintiff has not presented sufficient evidence of damages. The Court has considered the memoranda of the parties and this matter is now ripe for decision. For the reasons set forth below, Defendants' Motion for Summary Judgment is **DENIED**.

### I. FACTS AND PROCEDURAL HISTORY

On September 11, 2000, at approximately 4:15 p.m., Landis A. Cowles ("Plaintiff") was driving in a red Geo Metro on Forest Glen Drive, in Williamsburg, Virginia, towards the intersection with Centerville Road. (Dep. Cowles at 54; Dep. Peterson at 49–50.) Plaintiff passed Defendants in an unmarked car, and Defendants and Plaintiff recognized each other. (Dep. Cowles at 54, 63; Dep. Peterson at 46.) Peterson alleges that Plaintiff tried to hide his face from Defendants as they passed each other, but Plaintiff denies this. (Dep. Peterson at 45; Dep. Cowles at 63.) Defendants allege Peterson told Johnson that he believed Plaintiff's license had been suspended, and then Peterson called James City Dispatch ("Dispatch") to confirm Plaintiff's status. (Dep. Peterson at 46; Dep. Johnson at 25, 28.)[1] Defendants turned around to pursue Plaintiff, and Plaintiff appeared to accelerate gradually. (Dep. Peterson at 48–49; Dep. Johnson at 27.) Plaintiff pulled his vehicle into the driveway of Lula Long ("Long"). (Dep. Cowles at 54.) Plaintiff then turned off his engine and exited the car. (Dep. Cowles at 54.) As Plaintiff was exiting the car, Defendants parked behind Plaintiff's vehicle, in such a way that Plaintiff's vehicle could not leave the driveway.[2] (Dep. Peterson at 50–51.) Peterson alleges that he

---

**1.** Plaintiff has included Dispatch records in the record before the Court that Plaintiff contends demonstrates that Defendants did not radio Dispatch until after Plaintiff had been walked back to the car. (Pl. Mem. Opp. Mot. Summ. J. at 9 & Ex. 2.). While the Court cannot make a determinative finding based solely on the excerpt of the records provided to it, it will accept the Plaintiff's allegation as true for the purposes of this motion.

**2.** The Defendants appear to have pulled in directly behind Plaintiff, so that the front bumper of the Defendants' car was about half a car length behind Plaintiff's rear bumper. (Dep. Peterson at 52.)

believes Defendants radioed Dispatch at this time to mark their location (Dep. Peterson at 49); however, Johnson alleges that he did not call in anything and that Peterson got out of the car as soon as Johnson brought the car to a halt (Dep. Johnson at 29). Defendants both got out of their car. (Dep. Peterson at 53; Dep. Johnson at 29.) Plaintiff moved towards the Defendants to the rear of his vehicle. (Dep. Peterson at 53; Dep. Cowles at 54.) Plaintiff alleges he asked what the problem was. (Dep. Cowles at 54.) Peterson alleges that he asked Plaintiff why he was driving without a license. (Dep. Peterson at 53.) Plaintiff allegedly responded something to the effect of "Give me a break, I'm going to pick up my mother." (Dep. Peterson at 53; Dep. Johnson at 30.) At this points, the stories diverge significantly.

Defendants allege that Plaintiff was calm until Dispatch radioed on Peterson's portable radio that Plaintiff's license was suspended. (Dep. Peterson at 56; Dep. Johnson at 35.) At that point, Plaintiff allegedly became upset, exclaimed "F—k this s—t," and began running towards the back of Long's house. (Dep. Peterson at 56; Dep. Johnson at 35.) Plaintiff, on the other hand, alleges that Defendants asked if he had any drugs on him or in his car, and when Plaintiff said no, Defendants asked if they could search his car, to which Plaintiff also responded no. (Dep. Cowles at 54.) Plaintiff alleges that then Peterson walked by him as if to search the car, and Plaintiff said "Hey, wait a minute," at which point Johnson hit Plaintiff in the forehead with a can of mace. (Dep. Cowles at 54). Plaintiff alleges that he asked Johnson what his problem was, and Johnson told him to "shut the hell up." (Dep. Cowles at 55.) Plaintiff allegedly noticed that Peterson was now searching Plaintiff's car,[3] and Plaintiff started walking towards the car and telling Peterson to stop when Johnson struck him again. (Dep. Cowles at 55, 71.) Johnson claims that *he* did not search Plaintiff's car at any time, but makes no mention of what Peterson was doing. (Dep. Johnson at 35.) Plaintiff alleges that he then tried to back away from Johnson and Johnson tried to grab him, and Plaintiff noticed Peterson coming towards him. (Dep. Cowles at 55.) Peterson claims that he was talking to Plaintiff when he noticed that Plaintiff was getting agitated after the call from Dispatch, but did not suspect he would run, but made an attempt to grab Plaintiff's arms before he ran. (Dep. Peterson 57–58.) What Plaintiff and Defendants do agree on is that Plaintiff began to run from Defendants.

As Plaintiff ran, Defendants allege that they both called out for Plaintiff to stop. (Dep. Peterson at 60; Dep. Johnson at 42.) Plaintiff ran around the side of Long's house and stopped at a fence. (Dep. Cowles at 56.) Defendants pursued Plaintiff around this side of the house and ended up by a handicap ramp. (Dep. Peterson 59.) Plaintiff claims that he was facing the fence and Defendants grabbed him by the shoulder or neck and the arm, and slammed him down on the ground onto his stomach, pulling his arms behind his back, pushing his head on the ground, and cussing him out. (Dep. Cowles at 56, 83–85.) Defendants claim that Plaintiff was on his knees with his hands raised saying "I don't want to go to jail, you scare me." (Dep. Peterson at 60; Dep. Johnson at 42.) Defendants agree that they were trying to put Plaintiff's arms behind his back, but they were having a

---

**3.** Plaintiff alleges that Peterson took a few minutes to search his car, turning over items and papers in the car, pulling the back seat forward, and generally searching the passenger compartment, but never opening the trunk. (Dep. Cowles at 70.)

difficult time doing this, so they told Plaintiff to stop resisting, and Defendants attempted to handcuff Plaintiff. (Dep. Peterson at 61–62; Dep. Johnson at 45.) Plaintiff alleges that he felt something pop in his shoulder and he started to cry out, and Defendants called him a "f—king crybaby." (Dep. Cowles at 57.) Johnson denies that Plaintiff ever screamed out in pain. (Dep. Johnson 45.)

At this time, Michelle Johnson states that she observed two police officers twisting Plaintiff's arms behind his back and banging his head on the ground while cursing at him. (Aff. Michelle Johnson ¶ 5). Michelle Johnson asked why Defendants were struggling with Plaintiff. (Dep. Cowles at 58; Aff. Michelle Johnson ¶ 4.) Plaintiff alleges that Defendants told Michelle Johnson to shut up and leave, to which she responded that she would not leave and that the Defendants should not be "doing that" to the Plaintiff. (Dep. Cowles at 58; Aff. Michelle Johnson ¶¶ 5–6.)

Defendants walked Plaintiff back to their car in handcuffs. (Dep. Peterson at 66–67; Dep. Cowles 58; Aff. Michelle Johnson ¶ 6.) Peterson did not call in anything while he was chasing Plaintiff, nor can he recall if he radioed Dispatch after they returned to the car. (Dep. Peterson at 67.) At some time between the time Plaintiff was handcuffed and the time Defendants returned to the car with Plaintiff, Peterson searched Plaintiff's pockets. (Dep. Peterson 66.) A James City County police cruiser had arrived by this time. (Dep. Peterson 67; Dep. Cowles at 58.) Plaintiff alleges that the cruiser arrived because Long reported a fight between three men in her yard. (Pl. Mem. Opp. Mot. Summ. J. at 4.) Peterson is not sure if the cruiser arrived because he had radioed Dispatch or not. (Dep. Peterson at 67.) Plaintiff claims that when he and Defendants arrived at the car, Defendants told the newly arrived officer to call in to check on Plaintiff's license. (Dep. Cowles at 59.) Plaintiff continued to complain that his right shoulder hurt, but he was allegedly smiling, and did not appear to Peterson to be in pain. (Dep. Peterson at 73.) Plaintiff signed a Department of Motor Vehicles suspension notification, which is a standard form to notify the individual that his license has been revoked.[4] Defendants considered this an investigatory detention, not an arrest, and they did not charge Plaintiff with anything. (Dep. Johnson 50; Dep. Peterson 66.)

Plaintiff went to Williamsburg Community Hospital that day and was treated by Paul D. Cash, M.D. ("Dr.Cash"). (Dep. Cash at 5.) Dr. Cash found that Plaintiff had tenderness over his acromioclavicular ("AC") joint, and had difficulty raising his shoulder past twenty to thirty degrees of movement. (Dep. Cash at 7.) X-rays revealed a grade two[5] separation of Plaintiff's AC joint. (Dep. Cash at 7–8.) Dr. Cash indicated that this type of injury was usually caused by a fall or a direct blow to the shoulder, such as the type a football quarterback would take upon being tackled, requiring "a fair amount of force." (Dep. Cash at 8–9.) However, Dr. Cash also indicated that in his opinion, this type of injury would be more likely caused by a previous encounter Plaintiff allegedly had with the police than the incident described

---

**4.** The Defendants do not consider this to be a punishable offense. (Dep. Peterson at 73.)

**5.** Grade two means that there is evidence of damage to the ligaments and that the ligaments are damaged enough to cause separation of the joint, not complete separation. (Dep. Cash at 8.) There is debate in the community of orthopedic surgeons as to whether this requires surgery to fix. (Dep. Cash at 8.)

to Dr. Cash on this occasion.[6] (Dep. Cash at 12.)

Dr. Cash also found a contusion in the middle of Plaintiff's forehead, about one inch or more by one inch or more, which was swollen with evidence of bleeding underneath the skin from a blow to the head. (Dep. Cash at 7–8.)

On July 25, 2002, Plaintiff filed his complaint *pro se*, alleging police brutality, as an inmate filing under the Civil Rights Act, 42 U.S.C. § 1983 with the Western District of Virginia. On July 29, 2002, this action was transferred to the Eastern District of Virginia, Alexandria Division. On August 29, 2002, Plaintiff filed an Amended Complaint. On March 17, 2003, the district court ordered Defendants to file an answer. On May 16, 2003, Defendants filed their Answer. On October 20, 2003, this matter was transferred to the Eastern District of Virginia, Newport News Division. On January 9, 2004, Plaintiff requested appointment of counsel, a request which this Court found to be moot on January 15, 2004, because counsel had agreed to represent Plaintiff *pro bono*. On April 26, 2004, Plaintiff, by counsel, filed his Second Amended Complaint. On May 7, 2004, Defendants filed their Answer. On October 1, 2004, Defendants filed this current motion for summary judgment. On October 8, 2004, Plaintiff filed his response. On October 13, 2004, Defendants filed their rebuttal. This matter is now ripe for determination by the Court.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 56(c) provides for summary judgment if the Court, viewing the record as a whole, determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Haulbrook v. Michelin North Amer., Inc.*, 252 F.3d 696, 700 (4th Cir.2001)(citing *McKinney v. Bd. of Trustees of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir.1992))("[S]ummary judgment should be granted only when it is perfectly clear that no issue of material fact exists, and it is not necessary to inquire further into the facts in order to clarify the operation of the law.") In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat summary judgment, the nonmoving party must go beyond the pleadings with affidavits, depositions, interrogatories, or other evidence to show that there is in fact a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

 Qualified immunity provides that "government officials performing discretionary functions generally are shielded

---

6. Plaintiff was treated on May 21, 1999 at the Williamsburg Community Hospital for a shoulder problem allegedly caused by an altercation with the police. X-rays at that time revealed a dislocation or sprain of the AC joint on the right shoulder. Dr. Cash indicated that if left untreated, this condition could have become worse. Plaintiff alleged that he fell on his shoulder during the 1999 altercation. Dr. Cash indicated that it was his opinion that this type of fall would be more likely to cause Plaintiff's injury than having his arm behind his back during handcuffing. (Dep. Cash at 14–15.)

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The defense of qualified immunity may be a basis for summary judgment if there are no material facts in issue. *Harlow,* 457 U.S. at 815–16, 102 S.Ct. 2727; *see also Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir.1991)("[A] particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment."). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has stated that "[w]here the acts alleged by the plaintiff do constitute a violation of clearly established rights, a defendant is entitled to summary judgment if the record does not create a genuine issue as to whether the defendant in fact committed those acts." *Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988); *see also Mensh v. Dyer,* 956 F.2d 36, 39 (4th Cir.1991).

The first step in the qualified immunity inquiry is to ask the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)); *Jones v. Buchanan,* 325 F.3d 520, 526 (4th Cir.2003). A court might find it necessary in answering this question "to set forth principles which will become the basis for holding that a right is clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If no constitutional right was violated even if all the allegations are true, then the inquiry is at an end and qualified immunity should be granted. *Id.*

The second step in the inquiry is to ask whether the right was clearly established, in that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *Jones,* 325 F.3d at 526–27. The right must not exist in a generalized form, but

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. In commenting on this part of the analysis, the Fourth Circuit stated:

> [T]he assessment whether a "reasonable person" in the official's position would have known that his conduct would violate "clearly established" rights must be made on the basis of information actually possessed at the time by the official, or then readily available to him, and in light of the exigencies of time and circumstance in which the official took the action challenged. The tolerance thus accorded by the objective test to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection "to all but the plainly incompetent or those who knowingly violate the law" in order to avoid

undue inhibition of public officials in the discharge of their discretionary duties. *Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990)(Phillips, J., concurring)(quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (citations omitted); *see also Torchinsky,* 942 F.2d at 261 ("The very idea of reasonableness requires that courts accord interpretive latitude to official judgments. If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." (citation omitted)).

■ Qualified immunity is an affirmative defense, and must be plead by the respondent. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)(the burden of pleading good faith lies with the respondent). Rule 8(c) states that "a party shall set forth affirmatively ... any matter constituting an avoidance or affirmative defense." FED. R. CIV. P. 8(c). The court will not impose upon the plaintiff the obligation of anticipating the qualified immunity defense, and "it is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Gomez,* 446 U.S. at 640, 100 S.Ct. 1920. Defendants have plead qualified immunity as an affirmative defense in this case and so have satisfied this requirement.

## III. DISCUSSION

■ The Court first notes that Defendants urge the Court to adopt their statement of undisputed material facts pursuant to Local Civil Rule 56(b). This rule requires that the nonmoving party's response contain a "specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated" with appropriate citation to supporting documents. E.D. VA. LOCAL CIV. R. 56(b). The Court may, at its discretion, assume any fact that is not controverted to be admitted. *Id.* Defendants argue that Plaintiff's section entitled "Factual Summary" does not meet the requirements of the rule, and does not specifically indicate which of Defendants' facts Plaintiff admits or denies. The Court finds that Plaintiff's summary of facts and the record before the Court is sufficient for the Court to determine which, if any, genuine issues of material fact remain. Accordingly, the Court will not limit itself to the Defendants' Statement of Undisputed Material Facts.

For the purposes of this motion, the relevant facts as reasonably supported by the record and as taken in the light most favorable to Plaintiff are as follows: The Defendants passed Plaintiff in his car, and on suspicion that he might have drugs on him because of the Defendants' personal knowledge of and previous encounters with Plaintiff, turned around to follow Plaintiff, who then pulled into Long's driveway. Defendants parked in such a way as to prevent Plaintiff from leaving the driveway, and all three men emerged from their vehicles. Defendants asked Plaintiff if he had any drugs, and Plaintiff denied that he had any drugs. Defendants then asked for permission to search Plaintiff's car, and Plaintiff declined to give Defendants permission to search. Regardless, Defendant Peterson moved to search Plaintiff's car, and when Plaintiff objected, Defendant Johnson struck Plaintiff in the forehead with a can of mace. When Plaintiff continued to object, Johnson struck Plaintiff again. Plaintiff tried to move away, but Johnson made a grab for Plaintiff, and Peterson began to move towards Plaintiff, so Plaintiff fled around the side of Long's house. Defendants caught up with Plaintiff at a fence in Long's backyard and slammed him to the ground, pulled his

arms behind his back, pushed his face into the ground, and cursed at him. Plaintiff was handcuffed and walked back to Defendants' car, at which time Defendants radioed dispatch to check on the status of Plaintiff's license. After requiring Plaintiff to sign a suspension notification, Defendants released Plaintiff. Defendant suffered injury to his right shoulder and a contusion to his forehead. As a result of this encounter, Plaintiff alleges a state law claim of assault and battery and three violations of his rights under the federal constitution: (1) an unreasonable seizure, (2) an unreasonable search, and (3) excessive use of force. Defendants ask for summary judgment on the grounds that they are entitled to qualified immunity on these three constitutional claims, that they are entitled to sovereign immunity on the state law claim of assault and battery, and that Plaintiff has failed to allege sufficient facts to support his claims of damages. The Court addresses each of these arguments in turn.

## A. Unreasonable Seizure

■ Defendants concede that their encounter with Plaintiff was an investigatory stop. (Defs. Mem. Supp. Mot. Summ. J. at 9–10, 12.) It is clear that the Fourth Amendment requires that before an officer conducts an investigative detention or stop, the officer must have "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir.1997). "An officer who stops and detains a person for investigative questioning 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' While such detention does not require probable cause, it does require something more than an 'inchoate and un-

particularized suspicion or 'hunch'.'" *Sprinkle*, 106 F.3d at 617 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 & 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ The Fourth Circuit's analysis in *Sprinkle* is particularly applicable to the matter before the Court. In *Sprinkle*, the government argued that five facts provided the officers who made an investigatory stop with reasonable suspicion: (1) that the subject of the stop had a criminal record and had recently been released from prison on drug charges; (2) the subject was spotted in a high drug crime area; (3) that the subject and another individual had been seen with their hands close together in the subject's car; (4) that the subject lowered his head and covered his face with his hand as one of the officers walked by the car; and (5) the subject drove away as soon as the officers walked by. *Sprinkle*, 106 F.3d at 617. The *Sprinkle* Court also took note of the fact that it was not night but day time, the police did not actually see any criminal activity, the subject did not race away in an evasive manner, and the officers did not have to pull over the subject, but simply pulled up behind the subject to block him when he came to a stop for an unrelated traffic situation. *Id.* at 616–18. The *Sprinkle* Court found that the totality of the circumstances did not give the officers the necessary reasonable articulable suspicion to conduct an investigative stop. *Id.* at 618–19.

In this case, Plaintiff has alleged that the reason Defendants decided to follow him and question him was because, like the officers in *Sprinkle*, Defendants believed Plaintiff might have some drugs on him because of their past associations with him, his criminal narcotics record, and the fact that the Defendants considered this to be an area known for drug deals. Plaintiff's

interpretation of the dispatch records supports this allegation. This encounter occurred at approximately 4:30 p.m., at a similar time to the incident in *Sprinkle.* Like the subject in *Sprinkle,* Plaintiff did not drive away in an evasive manner—at most he gradually accelerated. (Dep. Peterson at 48.) Plaintiff came to a stop of his own accord, and Defendants pulled in behind him, much as the officers in *Sprinkle* did. As with the officers in *Sprinkle,* Defendants saw no actual criminal activity take place. Even if the Court accepted as true Defendants allegation that Plaintiff hid his face from Defendants as they passed, it would not distinguish this incident from the *Sprinkle* case. In *Sprinkle,* the officers at least saw an interaction with another individual that they might interpret as some sort of drug deal. In this case, there was not even that much behavior for the Defendants to rely upon. Clearly if the *Sprinkle* Court found that the stop at issue in that case was constitutionally improper, then this Court must find that the stop of Plaintiff, as taken in the light most favorable to Plaintiff, was in violation of Plaintiff's Fourth Amendment rights against unreasonable seizure.

For the same reason, the Court cannot find that an objectively reasonable officer would fairly believe in September 2000 that the Constitution would permit an investigatory detention upon these grounds. The Fourth Circuit has made it clear that the Fourth Amendment does not permit such a stop. Accordingly, Defendants' motion for summary judgment on this issue is DENIED.

## B. Unreasonable Search

 The illegal seizure of an individual taints any search in "temporal and causal" connection to the seizure, even if consent was obtained for the search. *United States v. Gooding,* 695 F.2d 78, 84 (4th Cir.1982). Because the Defendants were engaged in an unconstitutional seizure when they allegedly searched Plaintiff's car, they were clearly violating Plaintiff's Fourth Amendment right to be free from unreasonable searches. Additionally, because an objectively reasonable officer could not fairly believe that he was engaged in a constitutional seizure, he would also be held to know that he could not engage in a search in conjunction with such a seizure. Accordingly, Defendants' motion for summary judgment on this issue is also DENIED.

## C. Excessive Use of Force

 There is no question that if the use of force by officers during an arrest or investigatory stop of a free citizen is excessive under objective standards of reasonableness, then the officers violated the individual's Fourth Amendment rights. *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(citing *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)(quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Making an arrest or an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Whether the force used is reasonable requires an examination of a totality of the circumstances, including (1) how severe the crime being investigated is, (2) whether the individual in question poses an immediate threat to the safety of

the officers or other people, (3) whether the individual is fleeing or actively resisting arrest, and (4) the severity of the plaintiff's injuries. *Id.; Jones,* 325 F.3d at 527. These factors must be considered from the perspective of a reasonable officer on the scene; the good or bad intentions of the actual officers involved should not be considered in determining the constitutionality of the use of force. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865.

It is tempting to divide the events at issue here into two distinct actions—the force allegedly used on Plaintiff during the alleged search and the force used to subdue Plaintiff once he fled. In fact, Defendants would have the Court rule solely on the force used in response to Plaintiff's flight, potentially leaving the alleged assault for later proceedings. However, the Fourth Circuit has held that "[a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994). In *Rowland,* the defendant officer argued that the plaintiff's physical resistance to the officer's attempts to control him should have be enough to justify the force used by the officer to subdue the plaintiff. *Id.* The Fourth Circuit found that viewing the resistance in isolation from the officer's actions which precipitated the plaintiff's struggle with the officer was "to miss the forest for the trees." *Id.* The better view is to look at the circumstances in the totality, as directed by *Garner* and *Graham. See Rowland,* 41 F.3d at 173.

In this case, Plaintiff has alleged that Johnson hit him twice in the forehead with a can of mace when Plaintiff attempted to object to Peterson's alleged search of Plaintiff's car. Dr. Cash confirmed that Plaintiff had a contusion on his forehead consistent with being struck in the head. Only after being struck twice did Plaintiff flee from Defendants, who then subdued Plaintiff with what might be arguably justifiable force if the flight and subsequent handcuffing were viewed in isolation from the rest of the incident. However, there is no indication that, at the time of the alleged battery by Johnson, Plaintiff posed an immediate threat to the officers or any other individuals, nor that he was attempting to flee at this point in the encounter. There is no indication that either officer suspected Plaintiff of any type of violent criminal activity. Defendants were familiar with Plaintiff and had no reason to believe that he was a dangerous individual or involved in any substantial drug trafficking. (Dep. Peterson at 23, 30–31.) At best, it can be said that Defendants had a hunch that Plaintiff might have some drugs on him or in his car.[7] Acting on a hunch that an individual might have some small quantity of drugs, an objective officer conducting an investigatory stop of an individual with whom he was familiar and did not consider dangerous, and who was not attempting to flee, could not find it reasonable to strike the individual twice in the forehead with a can of mace, with sufficient force to cause a contusion. Viewing these allegations in the light most favorable to the Plaintiff, it is clear that the alleged assault and battery of Plaintiff by Defendant Johnson with the can of mace is sufficient to establish a violation of Plaintiff's Fourth Amendment right

---

7. Plaintiff alleges that the Defendants acted on suspicion of possession of drugs, whereas Defendants contend they acted on suspicion of a suspended license, which Defendants did not even consider to be a misdemeanor. (Dep. Peterson at 46, 73; Dep. Johnson at 25.) Ironically, if Defendants' rather than Plaintiff's contention of the reasoning behind Defendants investigation of Plaintiff was taken as true, the Court would find that their alleged assault on Plaintiff was even more unreasonable.

against excessive use of force. Additionally, when viewed as a totality of the circumstances, the subsequent alleged actions of the Defendants in throwing Plaintiff to the ground, pushing his head into the ground, and forcing his arms behind his back for handcuffing so as to cause or aggravate a shoulder injury, as a result of Plaintiff's flight from the assault by Johnson upon fear of additional harm, are also sufficient to establish a violation of Plaintiff's Fourth Amendment right against excessive use of force.

It is not enough to find that the force used was unreasonable under the objective standards of the Fourth Amendment; the Court must also find that the objectively reasonable officer would have known that his conduct was unlawful. Although the two analyses may seem similar, the qualified immunity analysis of reasonableness contains an additional dimension. *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151. Officers will be entitled to qualified immunity where, although they correctly perceived all the relevant facts, they made "reasonable mistakes as to the legality of their actions." *Id.* at 206, 121 S.Ct. 2151. The key is whether existing law gave the officers fair warning that their conduct would be unconstitutional. *Jones,* 325 F.3d at 531. "Although earlier cases involving 'fundamentally similar' or 'materially similar' facts 'can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.'" *Id.* (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

The question before the Court, taking the facts in the light most favorable to the Plaintiff, is whether an objective officer could reasonably believe that when an individual objects to a search of his car, but otherwise poses no threat to the officer, it is legally acceptable to strike that individu-

al in the forehead twice with sufficient force to cause a contusion, and then when that individual flees from the assault, to throw the person to the ground, shove his head against the ground, and force his hands behind his back in such a way as to injure his shoulder. No objectively reasonable officer could believe this to be the case.

It is clear from the Fourth Circuit's decision in *Jones* that it was well-established by September 2000 that when an individual does not pose an objective threat to an officer, the officer's right to use force is severely limited. *See Jones,* 325 F.3d at 531–35 (discussing a series of cases prior to November 1999 in which excessive force was found when handcuffed individuals were injured by actions of officers after the individuals had been secured); *see also Dixon v. Richer,* 922 F.2d 1456, 1462–63 (10th Cir.1991)(not objectively reasonable to strike with a flashlight the subject of an investigatory stop where, even though the subject acted in a way that could be interpreted by the officer as an act of resistance, the subject did not make any threatening moves nor was believed to be a threat); *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 (1st Cir.1990)(noting that an attack by an officer which appears to have "no justification, and no motive but punishment" constitutes excessive force). The Court notes that many of the incidents described in *Jones* involved more serious injuries than those which occurred in this case, but these cases also involved individuals whom the officers deemed dangerous enough to at least handcuff. *See Jones,* 325 F.3d at 531–35. Here, the Defendants were so confident in their relationship with and knowledge of Plaintiff that they made no attempts to even frisk him, never mind secure or restrain Plaintiff, before beginning the alleged search of Plaintiff's car. The Court cannot perceive of any objec-

tively reasonable officer who would believe that the Constitution allowed him to strike a non-threatening free person in the forehead with any object, and then to tackle and injure that person when he fled from the assault. Accordingly, Defendants' motion for summary judgment on this issue is DENIED.

### D. Assault and Battery

▇▇▇▇ Defendants claim that they are protected by sovereign immunity under Virginia law from Plaintiff's charge of assault and battery. "In Virginia, a government agent entitled to the protection of sovereign immunity is not immunized from suit. Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." *Colby v. Boyden*, 241 Va. 125, 128, 400 S.E.2d 184 (Va.1991). Gross negligence is the "absence of slight diligence, or the want of even scant care." *Id.* at 133, 400 S.E.2d 184 (quoting *Frazier v. City of Norfolk*, 234 Va. 388, 393, 362 S.E.2d 688 (1987)). Plaintiff has alleged facts to support his argument that Defendants assaulted Plaintiff without provocation during the encounter. The Court finds that Plaintiff has alleged sufficient facts to raise a genuine issue as to whether Defendants were grossly negligent.[8] Accordingly, Defendants' motion for summary judgment on the state law claim is DENIED.

### E. Damages

Defendants allege simply that the testimony of Plaintiff's doctors do not support his contention that his shoulder was injured during the struggle with the Defendants. While the Court agrees that Dr. Cash's testimony indicates that it is less likely that Plaintiff can prove that his shoulder injury was caused by this specific incident, the Court does not find that this is sufficiently conclusive for the purpose of a motion for summary judgment.

▇▇▇▇ Regardless, even if Plaintiff were unable to show any actual injuries, Plaintiff is entitled to at least nominal damages under § 1983 for violations of his constitutional rights. *Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *see Randall v. Prince George's County*, 302 F.3d 188, 208 (4th Cir.2002). Accordingly, the Court DENIES Defendants' motion for summary judgment on this issue as well.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

**IT IS SO ORDERED.**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

8. The Court does so without applying Virginia's four-part test for determining whether an act is entitled to the protection of sovereign immunity, and cautions the parties that no finding has been made as to whether the acts in question were ministerial or discretionary. *See Colby*, 241 Va. at 128–29, 400 S.E.2d 184.